# FEDERAL POWER COMMISSION *v.* TRANSCON-
# TINENTAL GAS PIPE LINE CORP. ET AL.

No. 45. Argued November 15, 1960.—Decided January 23, 1961.*

---

*Together with No. 46, *National Coal Association et al.* v. *Transcontinental Gas Pipe Line Corp. et al.,* also on certiorari to the same court.

1

2

*Solicitor General Rankin* argued the cause for petitioner in No. 45. With him on the briefs were *Assistant Attorney General Doub, Alan S. Rosenthal, Anthony L. Mondello, John C. Mason, Howard E. Wahrenbrock, Robert L. Russell, David J. Bardin, Samuel D. Slade* and *Willard W. Gatchell.*

*Jerome J. McGrath* argued the cause for petitioners in No. 46. With him on the brief were *Robert M. Landis, Robert E. Lee Hall* and *Welly K. Hopkins.*

*Randall J. LeBoeuf, Jr.* and *Richard J. Connor* argued the cause for respondents. With them on the briefs were *John T. Miller, Jr., James B. Henderson, William N. Bonner, Jr., Thomas F. Brosnan, Seymour B. Quel* and *Francis I. Howley.*

Briefs of *amici curiae,* urging reversal in No. 45, were filed by *William M. Bennett* for the State of California et al.; *T. J. Reynolds, L. T. Rice, Henry F. Lippitt II, Milford Springer, Joseph R. Rensch, W. James MacIntosh, J. David Mann, Jr.* and *William W. Ross* for the Southern California Gas Co. et al.; *Paul L. Adams,* Attorney General of Michigan, *Samuel J. Torina,* Solicitor

General, and *A. C. Stoddard,* Assistant Attorney General, for the Michigan Public Service Commission; and *John W. Reynolds,* Attorney General of Wisconsin, and *William E. Torkelson* for the State of Wisconsin et al.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

The question in these cases is whether the Federal Power Commission has gone beyond the scope of its delegated authority in denying a certificate of public convenience and necessity under § 7 (e) of the Natural Gas Act of 1938, 52 Stat. 821, as amended, 15 U. S. C. § 717 *et seq.*[1] The principal respondents[2] are Transcontinental Gas Pipe Line Corp. (Transco), a pipeline company

---

[1] Section 7 (e), 15 U. S. C. § 717f (e), provides:

"(e) Except in the cases governed by the provisos contained in subsection (c) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of the Act and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. The Commission shall have the power to attach to the issuance of the certificate and to the exercise of the rights granted thereunder such reasonable terms and conditions as the public convenience and necessity may require."

[2] In addition to the petitioning Federal Power Commission and respondents Transco and Con. Ed., several other parties have been involved in this litigation. The City of New York is a named respondent and the petitioners in No. 46 include the National Coal Association, the United Mine Workers of America, and the Fuels Research Council, Inc. Several parties have filed briefs as *amici curiae* in this Court, including the regulatory commissions of California, Michigan, and Wisconsin. These state commissions have argued in support of the Federal Power Commission's position.

engaged in transporting natural gas in interstate commerce, and Consolidated Edison Co. (Con. Ed.), a public utility in New York City which uses gas under its boilers and also sells gas to domestic consumers. In 1957 Con. Ed. contracted to purchase gas from producers in the Normanna and Sejita fields in Texas at 19¼ cents per Mcf., the contracts of sale containing a prohibition on resale of the gas by Con. Ed. This transaction is commonly labeled a "direct" sale and, because it does not entail a sale for resale in interstate commerce, is not subject to the Commission's jurisdiction except insofar as § 7 requires the Commission to certificate the transportation of gas pursuant to the sale.

Con. Ed. then arranged with Transco for what is called in the record "X–20" service. Under the contract, Transco agreed to transport 50,000 Mcf. daily to Con. Ed. in New York for use under Con. Ed.'s boilers, principally two boilers at Con. Ed.'s Waterside station which were then being fired by coal. Additionally, during a 60-day peak period, Transco agreed to sell 50,000 Mcf. to Con. Ed. from Transco's own reserves without restrictions as to resale. This 60-day supply was designed for use by Con. Ed.'s customers during the winter period when heating demands were at their highest. Transco sought a certificate of public convenience and necessity for the proposed X–20 service in connection with its plan to conduct a major expansion of its pipeline capacity and storage facilities.

Before the hearing examiner, Transco's application was opposed by the FPC staff and groups representing the coal industry. Con. Ed. intervened in favor of Transco's proposal. Transco offered proof that its application met all the conventional tests—adequate gas reserves, pipeline facilities and market for the gas—and this showing, with one immaterial exception, has never been challenged. However, the FPC's staff argued vigor-

ously that the public interest would suffer were Transco's petition granted. Among the grounds advanced were that the gas was to be transported for use under industrial boilers, this disposition being an "inferior" use from the standpoint of conserving a valuable natural resource; that authorization of this and similar direct sales to major industrial users would result in pre-emption of pipeline capacity and gas reserves to the detriment of domestic consumers competing for gas supply; and that the effect of this sale, as well as the resulting increase in direct sales, would effect a general rise in field prices. These contentions were presented as "policy" arguments and no testimony was taken in support. Con. Ed. contended in return that certification was in the public interest, principally because a firm supply of natural gas under the Waterside boilers would reduce the air pollution problem then being aggravated by fly-ash and sulphur dioxide emissions from these boilers. The Waterside station is located near the headquarters building of the United Nations, and Con. Ed. introduced expert testimony indicating that the Waterside boilers were major contributors to the air pollution problem in the area. Respondents also contended that the factors propounded by the FPC's staff were not open for consideration in a § 7 proceeding. The hearing examiner agreed with respondents that his determination was limited to conventional factors and consequently recommended certification. He qualified his recommendation, however, with a statement that, if he were authorized to consider the policy argument related to the end use of the gas advanced by the FPC staff, he would come to the opposite conclusion. He indicated that respondents' proof concerning the air pollution problem was not sufficienty compelling to overcome this contrary argument.

On review before the full FPC, the Commission held that the broad considerations advanced by its staff

were cognizable in a § 7 proceeding. The Commission agreed with respondents that the "idea of ameliorating a smoke condition found unpleasant and annoying . . . is an attractive one" but concluded that "more weighty considerations compel the denial of the grant." 21 F. P. C. 138, 142. Respondents sought a rehearing before the Commission and, upon denial of that petition, 21 F. P. C. 399, appealed to the Court of Appeals. The Court of Appeals reinstated the conclusion of the hearing examiner that the policy considerations advanced by the FPC were outside the scope of a § 7 proceeding. The court relied principally on § 1 (b) of the Natural Gas Act, 15 U. S. C. § 717 (b), which provides:

"The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

The court also expressed sympathy with respondents' contention that the Commission had given inadequate weight to the air pollution factor; but the holding below does not appear to be based on that ground. 271 F. 2d 942.

The principal question before this Court, then, is whether Congress intended to preclude the Commission from denying certification on the basis of the policy considerations advanced by its staff. For purposes of analysis, the litigants have grouped these factors into two broad categories. The first has been labeled the "end use" factor and reflects the Commission's concern that Con. Ed.'s

proposed "inferior" use of gas under its industrial boilers would be wasteful of gas committed to the Commission's jurisdiction and, by the same token, would pre-empt space in pipelines that might otherwise be used for transportation of gas for superior uses. The second may be called the "price" consideration and involves the Commission's fear that this sale—which was executed at a price higher than the maximum fixed by the Commission in the producing districts here involved—would increase the price of natural gas in the field, thus triggering a rise in the price provisions in other contracts.

In light of what this Court has said on prior occasions concerning the term "public convenience and necessity" in analogous statutes, the ready inference is that the Commission has the power to consider the "end use" and "price" factors. For example, in *United States* v. *Detroit & Cleveland Navigation Co.*, 326 U. S. 236, 241, the Court concluded that:

> "The Commission is the guardian of the public interest in determining whether certificates of convenience and necessity shall be granted. For the performance of that function the Commission has been entrusted with a wide range of discretionary authority. *Interstate Commerce Commission* v. *Parker,* 326 U. S. 60. Its function is not only to appraise the facts and to draw inferences from them but also to bring to bear upon the problem an expert judgment and to determine from its analysis of the total situation on which side of the controversy the public interest lies. Its doubt that the public interest will be adequately served if resumption of service is left to existing carriers is entitled to the same respect as its expert judgment on other complicated transportation problems. . . ." See *Interstate Commerce Comm'n* v. *Railway Labor Executives Assn.,* 315 U. S. 373, 376–377.

In fact, in interpreting this very section, we said that "§ 7 (e) requires the Commission to evaluate *all* factors bearing on the public interest." *Atlantic Refining Co.* v. *Public Service Comm'n,* 360 U. S. 378, 391. (Emphasis added.) However, respondents correctly point out that Congress, in enacting the Natural Gas Act, did not give the Commission comprehensive powers over every incident of gas production, transportation and sale. Rather, Congress was "meticulous" only to invest the Commission with authority over certain aspects of this field, leaving the residue for state regulation. *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n,* 332 U. S. 507. Therefore, it is necessary to consider with care whether, despite the accepted meaning of the term "public convenience and necessity," the Commission has trod on forbidden ground in making its decision.

*End use.* No one disputes that natural gas is a wasting resource and that the necessity for conserving it is paramount.[3] As we see it, the question in this case is whether the Commission, through its certification power, may prevent the waste of gas committed to its jurisdiction. One apparent method of preventing waste of gas is to limit the uses to which it may be put, uses for which another, more abundant fuel may serve equally well. Thus the Commission in this case, as it often has in the past,[4] has declared that the use of gas under industrial boilers is an "inferior" use, the assumption being that other fuels, particularly coal, are an adequate substitute[5] in areas

---

[3] See F. P. C., Natural Gas Investigation (1948), Docket G–580, Olds-Draper Report, pp. 6–14.

[4] The cases in which the Commission has considered the end-use factor are collected in the Court of Appeals' opinion. 271 F. 2d, at 949, n. 27.

[5] The Commission's long-standing conclusion that the use of gas under industrial boilers is an inferior use is amply supported by authority. See, *e. g.,* Blachly and Oatman, Natural Gas and the Public Interest, 142.

where such other fuels abound. However, respondents, while conceding the premise that gas may be wasted where coal is readily available, argue that Congress has not awarded the Commission *any* powers over conservation; rather, this authority has been reserved to the States. This contention is based on the legislative history of the Natural Gas Act.

When Congress initially enacted the Natural Gas Act in 1938, all the indications were that Congress intended the States to be the primary arbiters of conservation problems. The 1938 Act was based on a 1936 report rendered by the Federal Trade Commission [6] and the section in that report devoted to conservation stresses the powers of state bodies to adopt corrective measures. The final recommendation of the Federal Trade Commission in regard to conservation contemplated primary state authority, with federal agencies being relegated to a reporting function. This recommendation formed the basis for § 11 of the Act as ultimately passed and that section reveals a secondary role for the Commission in this regard.[7]

---

[6] Federal Trade Commission, Final Report to the Senate of the United States, S. Doc. No. 92, 70th Cong., 1st Sess., Part 84–A. Section 1 (a) of the Act, 15 U. S. C. § 717 (a), refers explicitly to this report.

[7] Section 11 of the Act, 15 U. S. C. § 717j, provides:

"(a) In case two or more States propose to the Congress compacts dealing with the conservation, production, transportation, or distribution of natural gas it shall be the duty of the Commission to assemble pertinent information relative to the matters covered in any such proposed compact, to make public and to report to the Congress information so obtained, together with such recommendations for further legislation as may appear to be appropriate or necessary to carry out the purposes of such proposed compact and to aid in the conservation of natural-gas resources within the United States and in the orderly, equitable, and economic production, transportation, and distribution of natural gas.

"(b) It shall be the duty of the Commission to assemble and keep current pertinent information relative to the effect and operation

However, in 1940, the Commission reported its dissatisfaction with the limited scope of § 7. The 1938 version of § 7 restricted the Commission's jurisdiction to certification of transportation into areas where the market was already being served by another natural gas company; if a pipeline wished to extend service into virgin territory, the Commission had no power to act. The Commission felt that this limitation barred it from considering "the broad social and economic effect of the use of various fuels" in a § 7 proceeding, *Kansas Pipe Line & Gas Co.*, 2 F. P. C. 29, 57, and, in its 1940 Annual Report, the Commission urged that the restriction be deleted in order that conservation considerations might be weighed. The language used by the Commission is particularly relevant to this case:

> "The Natural Gas Act as presently drafted does not enable the Commission to treat fully the serious implications of such a problem. The question should be raised as to whether the proposed use of natural gas would not result in displacing a less valuable fuel

---

of any compact between two or more States heretofore or hereafter approved by the Congress, to make such information public, and to report to the Congress, from time to time, the information so obtained, together with such recommendations as may appear to be appropriate or necessary to promote the purposes of such compact.

"(c) In carrying out the purposes of this chapter, the Commission shall, so far as practicable, avail itself of the services, records, reports, and information of the executive departments and other agencies of the Government, and the President may, from time to time, direct that such services and facilities be made available to the Commission."

Other indications that Congress initially contemplated state control over conservation are found in the remarks of Congressman Mapes, a member of the committee reporting the bill that became the Natural Gas Act, 81 Cong. Rec. 6726, and Col. Chantland, counsel representing the Federal Trade Commission before Congress, Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on H. R. 11662, 74th Cong., 2d Sess. 66–67.

and create hardships in the industry already supplying the market, while at the same time rapidly depleting the country's natural-gas reserves. Although, for a period of perhaps 20 years, the natural gas could be so priced as to appear to offer an apparent saving in fuel costs, this would mean simply that social costs which must eventually be paid had been ignored.

"Careful study of the entire problem may lead to the conclusion that use of natural gas should be restricted by functions rather than by areas. Thus, it is especially adapted to space and water heating in urban homes and other buildings and to the various industrial heat processes which require concentration of heat, flexibility of control, and uniformity of results. Industrial uses to which it appears particularly adapted include the treating and annealing of metals, the operation of kilns in the ceramic, cement, and lime industries, the manufacture of glass in its various forms, and use as a raw material in the chemical industry. General use of natural gas under boilers for the production of steam is, however, under most circumstances of very questionable social economy." 20 F. P. C. Ann. Rep. 79 (1940).

The Commission implemented its recommendation by submitting to Congress a proposed amendment to § 7 with the restrictive language eliminated, and an amendment substantially similar to the one drafted by the Commission was enacted in 1942.[8] During the course of the

---

[8] Section 7 (c) of the Act, as originally enacted in 1938, provided, in part, that:

"(c) No natural-gas company shall undertake the construction or extension of any facilities for the transportation of natural gas to a market in which natural gas is already being served by another natural-gas company, or acquire or operate any such facilities or extensions thereof, or engage in transportation by means of any new

hearings on the amendment, the Commission reiterated the position it had taken in its 1940 report, Hearings before the House Committee on Interstate and Foreign Commerce on H. R. 5249, 77th Cong., 1st Sess. 82, and the language used by the Committees reporting the bill indicates that the amendment was framed in response to the Commission's complaint. H. R. Rep. No. 1290, 77th Cong., 1st Sess. 3; S. Rep. No. 948, 77th Cong., 2d Sess. 1–2.

It is true, of course, that the Committee reports do not set out the Commission's position *in haec verba*. For

or additional facilities, or sell natural gas in any such market, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity require or will require such new construction or operation of any such facilities or extensions thereof . . . ." 52 Stat. 825.

The Commission's proposed amendment was first introduced as H. R. 4819, 87 Cong. Rec. 4301, and later resubmitted as H. R. 5249. The bill, as proposed by the Commission, insofar as here pertinent read:

"No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations . . . ." Hearings before the House Committee on Interstate and Foreign Commerce on H. R. 5249, 77th Cong., 1st Sess. 1.

This section, as finally enacted, reads:

"(c) No natural-gas company or person which will be a natural-gas company upon completion of any proposed construction or extension shall engage in the transportation or sale of natural gas, subject to the jurisdiction of the Commission, or undertake the construction or extension of any facilities therefor, or acquire or operate any such facilities or extensions thereof, unless there is in force with respect to such natural-gas company a certificate of public convenience and necessity issued by the Commission authorizing such acts or operations . . . ."

example, the pertinent language of the House Committee Report states that:

> "The bill, as amended, eliminates the objections to the present section 7 (c) above mentioned. By this legislation, the present jurisdictional disputes are eliminated, and the door is opened to the consideration by the Commission of the effect of construction and extensions upon the interests of producers of competing fuels and competitive transportation interests. This result is accomplished, moreover, without undue disturbance of existing operating arrangements of natural-gas companies." [9] H. R. Rep. No. 1290, *supra*.

---

[9] S. Rep. No. 948 states that:

"The bill (H. R. 5249) would require a certificate from the Federal Power Commission to engage in the transportation or sale of natural gas or the construction, extension, or operation of natural-gas facilities subject to the jurisdiction of the Federal Power Commission. At the present time the Natural Gas Act requires a certificate of public convenience, only for the extension of construction or extension of service 'to a market in which natural gas is already being served by another natural-gas company.' The terms of this limitation are not defined by the act. Long preliminary investigations are required to determine whether or not the Federal Power Commission has jurisdiction to grant or to deny a certificate. Too, the Commission has held in the case of an extension by a gas company to a market already served by a competing company that the views or interests of competing fuel companies cannot be considered.

"Provisions of the Natural Gas Act empower the Commission to prevent uneconomic extensions and waste, but it can so regulate such powers only when the extension is to 'a market in which natural gas is already being served by another natural-gas company.' Thus the possibilities of waste, uneconomic and uncontrolled extensions are multiple and tremendous. The present bill would correct this glaring inadequacy of the act. It would also authorize the Commission to examine costs, finances, necessity, feasibility, and adequacy of proposed services. The characteristics of their rate structure could be studied. Obviously these are powers that Federal Power Commission should have and should exercise in the public interest."

Consequently, respondents argue that Congress only authorized the Commission to look at one side of the coin—the health of the coal industry—because that is the only point mentioned explicitly. However, this contention does not take adequate account of the position the Commission had consistently pressed upon Congress both prior to and during the hearings on the amendment—that the use of gas for purposes adequately served by other fuels was undesirable not only because it injured the competing industry but, what is more important, because it was wasteful to use a fuel in short supply in place of an abundant fuel. See 20 F. P. C. Ann. Rep. 79 (1940). The history of the amendment reveals no voice raised in opposition to the Commission's position and there is no other indication that Congress was unwilling to give the chief proponent of the amendment anything less than it sought. Thus, it would be curious were we to infer such an intent from the language of the House Committee Report quoted above. Rather, we think it plain the Congress acquiesced in the Commission's position and the excerpted language signifies acquiescence. It should be noted that this is not the first time this Court has addressed itself to the effect of the 1942 amendment to § 7. See *Federal Power Comm'n* v. *Hope Natural Gas Co.,* 320 U. S. 591, 617, n. 30, and *Federal Power Comm'n* v. *East Ohio Gas Co.,* 338 U. S. 464, 468–469. And, while it must be conceded that the language pertinent here was not necessary to the decision in either *Hope* or *East Ohio,* the clear conclusion of the Court in those cases is directly opposed to respondents' present argument.

Respondents, however, vigorously contend that, subsequent to the 1942 amendment, the Commission itself has made statements on occasion which are inconsistent with the Commission's position in this case. In particular, respondents point to an excerpt from the Commission's

1944 Report to Congress, entitled The First Five Years Under the Natural Gas Act, where the Commission stated:

"In its hearings on certificate cases, under section 7 (c) of the act, as amended, the Commission has freely permitted the intervention of representatives of coal, railroad, labor, and other interests concerned with the production or transportation of competing fuels. These interests have presented extensive evidence on the economic, sociological, and technological aspects of fuel competition, and their representatives have strongly urged the Commission either to deny certificates on the general grounds of conservation or to attach restrictions which would severely limit the uses for which natural gas might be sold.

"It has been the unanimous view of the Commission that, inasmuch as the Congress had not given it comprehensive powers to deal with the end uses for which natural gas is consumed, and had granted the Commission no authority to regulate rates for the direct sales of natural gas to industry, it was the duty of the Commission not to seek to exercise such authority until the Congress amended the Natural Gas Act to confer on the Commission such specific powers as Congress desired it to exercise."
F. P. C., The First Five Years Under the Natural Gas Act 15.

This statement was relied on heavily by the Court of Appeals and it would be idle to contend that the report is irrelevant to the present inquiry. However, it is necessary to note the precise limit of the Commission's admissions. The Commission said that it had not been given "comprehensive" authority to deal with "the end uses for which natural gas is consumed" and that it would not

16

deny certification on that ground alone.[10]   The Com-
mission did *not* say that it had no authority over the use
to which certificated gas might be put nor did it say
that end use was a factor beyond its power of notice.
In view of contemporaneous statements by the Commis-
sion which would be inconsistent with the reading re-
spondents press upon us,[11] we think that the 1944 report

[10] The passage excerpted and relied upon by the Court of Appeals
should be read with reference to the footnote appended thereto.  In
this footnote, the Commission stated:

"In its Opinion No. 93–A, which accompanied its order of Septem-
ber 24, 1943, issuing a certificate of public convenience and necessity
to Tennessee Gas & Transmission Co. for the construction and opera-
tion of a natural-gas pipe line from Texas to West Virginia, the
commission stated:              –

" 'Interveners representing coal operators, labor unions, and rail-
roads, having a vital stake in the coal industry in the Appalachian
area, oppose the granting of a certificate for the construction of
applicant's proposed natural-gas pipe line principally on the ground
that the present and future fuel needs of that area can be adequately
met by coal.  It is contended that the use of natural gas for industrial
and space-heating purposes constitutes a dissipation of the natural-
gas resources, and threatens the coal industry with ruinous competi-
tion.  Considerable evidence was adduced by these interveners for
the purpose of supporting such contentions.

" 'We recognize the force of these arguments and are not unmindful
of the economic and social aspects of the problem posed by these
interveners.  We are not authorized, however, to regulate rates for
natural gas sold directly to industrial consumers, which class of gas
sales furnishes the keenest competition to the coal industry.  Nor does
our power to suspend rates extend to indirect sales of natural gas
for industrial purposes.  It appears, therefore, that the Natural Gas
Act does not vest this Commission with *complete and comprehensive
authority* which would permit us to act as arbiter over the end uses
of natural gas.' "   F. P. C., The First Five Years Under the Natural
Gas Act 15, n. 14.  (Emphasis added.)

[11] See the Commission's statement reproduced in S. Rep. No. 1234,
78th Cong., 2d Sess. 3–6.  The Senate Committee itself recognized
that, following the 1942 amendment to the Act, the Commission was
directly concerned with conservation problems.  *Id.*, at 1–2.

should be construed as admitting only a lack of comprehensive power to formulate a flat rule against direct sales for use under industrial boilers.

In this connection, it must be realized that the Commission's powers under § 7 are, by definition, limited. See Koplin, Conservation and Regulation: The Natural Gas Allocation Policy of the Federal Power Commission, 64 Yale L. J. 840, 862. The Commission cannot order a natural gas company to sell gas to users that it favors;[12] it can only exercise a veto power over proposed transportation and it can only do this when a balance of *all* the circumstances weighs against certification. Moreover, the Commission has no authority over intrastate sales under any section of the Act and, since a large percentage of the gas sold for so-called "inferior" uses is sold within the producing States,[13] this restriction further curtails the Commission's power over conservation. In light of this, the Commission's position since the 1942 amendment is both consistent and rational. On the one hand, the Commission has stated that it does have power to consider end use in a § 7 proceeding. On the other hand, the Commission has sought, but has not been awarded, comprehensive authority over all aspects of gas conservation. A most striking example of the Commission's thinking is revealed by its reasons for *opposition* to H. R. 982, a bill proposed in 1949 which would have declared that:

> ". . . the public interest requires the establishment of, and adherence to, a policy with respect to the

---

[12] Under § 7 (a) of the Act, 15 U. S. C. § 717f (a), the Commission has authority to compel extensions, though not enlargements, of a natural gas company's transportation facilities unless "to do so would impair its ability to render adequate service to its customers."

[13] See Hearings before a Subcommittee of the House Committee on Interstate and Foreign Commerce on H. R. 79, H. R. 1758, and H. R. 982, 81st Cong., 1st Sess. 165.

18

transportation of natural gas and the sale thereof in interstate commerce, which will—

"(1) promote and safeguard, so far as possible, the national defense;

"(2) conserve the reserves of natural gas for utilization which affords the highest social benefits to the public, consistent with reasonable rates and adequate service." [14]

The Commission argued against passage on, among others, the following ground:

"The 10-point policy would—

.        .        .        .        .

"(2) Conserve the reserves of natural gas for utilization which affords the highest social benefits to the public, consistent with reasonable rates and adequate service;

"This, of course, proposes a limitation on the purposes for which gas may be utilized. In order to be fully effective it would be necessary to extend the Commission's jurisdiction to intrastate sales because the great bulk of gas sold for so-called inferior industrial uses is either sold in the field or by distributing companies over which the Commission does not have jurisdiction. The Commission, however, is aware of the problem and in certificate cases it does give consideration to the proposed uses of the gas in question. The Commission believes that, under the present act, it may give proper consideration to this matter in certificate proceedings." [15]

In light of this language, it is clear that the Commission fully realizes the distinction between the power it enjoys

---

[14] *Id.*, at 3.

[15] *Id.*, at 165.

under § 7 and complete allocation power.[16]   And we feel that this distinction entirely disposes of those contentions of respondents based on the Commission's purported ambivalent behavior.

There is a broader principle here which also stands in opposition to respondents' contentions.   When Congress enacted the Natural Gas Act, it was motivated by a desire "to protect consumers against exploitation at the hands of natural gas companies." *Sunray Mid-Continent Oil Co.* v. *Federal Power Comm'n,* 364 U. S. 137, 147.   To that end, Congress "meant to create a comprehensive and effective regulatory scheme." *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n,* 332 U. S. 507, 520.   See *Public Utilities Comm'n* v. *United Fuel Gas Co.,* 317 U. S. 456, 467.   It is true, of course, that Congress did not desire comprehensive *federal* regulation; much authority was reserved for the States.   But, it is equally clear that Congress did not desire that an important aspect of this field be left unregulated.   See *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n, supra.*   Therefore, when a dispute arises over whether a given transaction is within the scope of federal or state regulatory authority, we are not inclined to approach the problem negatively, thus raising the possibility that a "no man's land" will be created.   Compare *Guss* v. *Utah Labor Board,* 353 U. S. 1. That is to say, in a borderline case where congressional authority is not explicit we must ask whether state authority can practicably regulate a given area and, if we

---

[16] During the course of hearings held in 1947 on proposed amendments to the Natural Gas Act, Commissioner Smith summed up the position of the Commission and explained the language used in the 1944 report along substantially the same lines as we have pursued. Hearings before the House Committee on Interstate and Foreign Commerce on H. R. 2185, H. R. 2235, H. R. 2292, H. R. 2569, and H. R. 2956, 80th Cong., 1st Sess. 685–686.

20

find that it cannot, then we are impelled to decide that federal authority governs.

In this case, the dispute is over the "economic" waste of gas which has been committed to transportation in interstate commerce outside the producing State. The Commission has not attempted to exert its influence over such "physically" wasteful practices as improper well spacing and the flaring of unused gas which result in the entire loss of gas and are properly of concern to the producing State; nor has the Commission attempted to regulate the "economic" aspects of gas used within the producing State. Respondents contend that, even in this posture, the Commission has usurped the functions of state regulating bodies but we cannot agree.

In the 1936 Federal Trade Commission Report, upon which respondents so heavily rely, there was some mention of control of the end use of gas and, as we have said, this report was strongly oriented towards state regulation. However, as the Court of Appeals pointed out, the primary emphasis was on physical waste of gas within the producing State and the reference to end use probably contemplated the use of gas in gasoline extraction and the manufacture of carbon black. 271 F. 2d, at 947. There is no indication that the Federal Trade Commission or Congress was thinking in terms of state-controlled "economic" conservation of gas committed to interstate commerce. Moreover, it is questionable whether any State could be expected to take the initiative in enforcing this type of "economic" conservation. A producing State might wish to prolong its gas reserves for as long as possible but producing States have no control over the use to which gas is put in another State. See *Michigan-Wisconsin Pipe Line Co.* v. *Calvert*, 347 U. S. 157; *Pennsylvania* v. *West Virginia*, 262 U. S. 553; *Oklahoma* v. *Kansas Natural Gas Co.*, 221 U. S. 229. Consuming States may control the end use of gas, *Panhandle Eastern*

*Pipe Line Co.* v. *Michigan Public Service Comm'n,* 341 U. S. 329, but the deficiencies of this system in the present context are apparent—unless all States cooperate in enforcing a common regulation, the producer may pick a State which is sufficiently anxious for this scarce resource that it will take gas irrespective of the use.[17]   Therefore,

---

[17] The helplessness of a consuming State in this regard is dramatically illustrated by the opinion of the New York Public Service Commission in *In re Cabot Gas Corp.,* 16 P. U. R. (N. S.) 443 (1936). The language used by the Chairman of the Commission is particularly relevant in this context:

"There can be but one opinion among those who believe in the conservation of natural resources.  They should be developed not to benefit a few individuals but in the interests of public welfare present and future.  Our natural gas resources ought to be conserved and there is probably no field where the Federal government acting in the interests of the entire country and to protect the welfare of the future could accomplish more than in the natural gas industry. From a conservation viewpoint, I thoroughly agree with Commissioner Burritt, and if I could see how a denial of the present petition would work to this end, I would vote to refuse the application; but will such denial produce the desired results?

"The field from which gas is to be taken by the petitioner is in northern Pennsylvania and southern New York.  Apparently, far more of the gas will come from Pennsylvania than from New York and over the extraction of gas in the state of Pennsylvania, this Commission has practically no control.  It is possible for Pennsylvania companies to take all of the gas from this field unless the New York companies remove the gas before the field is exhausted.

"Further, the Public Service Commission has been given no adequate authority to determine how the natural gas resources of this state, to say nothing of the resources of Pennsylvania, shall be developed.  We have no powers directly to control the amount of gas that is taken from any field and our indirect powers are so limited that it is doubtful if much could be accomplished.  The state of New York receives far more gas from sources located beyond its boundaries than it exports to any adjoining state and the conservation of natural gas resources in the various states cannot be properly brought about except through voluntary action of the states or by the Federal government.  Neither one is yet operative and while

it appears that, consistent with the congressional purpose of leaving no "attractive gap" in regulation, we must conclude that the "end-use" factor was properly of concern to the Commission.

---

attention has been given to electric interstate commerce, no effective steps have been taken to conserve or regulate the distribution of natural gas, where it is so urgently needed.

"In view of the lack of authority conferred upon this Commission to conserve natural resources, the question becomes primarily what will be gained to consumers in the state of New York if the petition is denied. It is stated that about 80 or 90 per cent of the gas furnished by the petitioner will be used for industrial purposes and that only from 10 to 20 per cent will go to the general public, the inference being that the saving to the companies purchasing the gas will go to enrich a few stockholders. Let us assume such are the facts. Who will gain if those benefited by the petition are deprived of their profits or advantages by a denial of the petition? This Commission does not control the use that will be made of the gas from the field tapped by the petitioner. There are many other companies tapping the supply and we have no means of determining where, when, or to whom the gas will be sold. If restriction is imposed on the use of it in New York, it may go to Pennsylvania; and if the petitioner is not allowed to supply the areas which it is proposed to serve, the gas will go to other areas and there is no assurance that it will be used any more beneficially from a public viewpoint than it will be if the petition is granted.

"As stated, I am heartily in favor of the conservation of natural gas as well as other natural resources; but in this specific case, will the granting or the denial of the petition work to the benefit of the people of New York? The benefit to the area to be supplied by the petitioner is definite, it is known, it is sure. But if the petition is denied, who will be benefited? There is no assurance upon this point. The answer is speculative and uncertain. There is nothing to assure us that the denial of the petition would conserve the gas supply. Is it not likely that the benefits would merely be diverted from one group or one locality to another?"

It might be argued that this attitude is out of date since the Commissioner was speaking prior to the enactment of § 11 of the Natural Gas Act. See note 7, *supra*. However, the success of § 11 can be measured by examination of the Olds-Draper Report, note 3, *supra*, at pp. 75–78.

*Price.* As we read the opinion, the Commission's second objection to certification was based on its forecast that this and similar direct sales of gas at unregulated prices higher than those allowed in sales for resale [18] would attract gas to the high-bidding direct purchasers and thus lever upwards field prices both in direct sales and sales for resale.

Respondents claim that this "policy" consideration masks the Commission's true purpose in this proceeding, which, according to respondents, is to bar direct sales absolutely, thus forcing all gas transactions into regulated channels. And respondents argue that such an absolute bar runs contrary to the intent of Congress as expressed in § 1 (b) of the Natural Gas Act quoted *supra,* the section which limits the FPC's jurisdiction to sales *for resale* in interstate commerce.

Were respondents correct in their interpretation of the Commission's action in this case, we would be forced to agree that the Commission had overstepped its bounds. Certainly such action would be contrary to our previous statements that the term "public convenience and necessity" connotes a flexible balancing process, in the course of which all the factors are weighed prior to final determination. *United States* v. *Detroit & Cleveland Navigation Co., supra.*[19] Indeed, as respondents argue, such a flat rule would be doubly objectionable here because

---

[18] The Commission has recently set field prices for sales for resale in the area where this gas was bought at 18 cents per Mcf. See 25 Fed. Reg. 9578. The sales price to Con. Ed. in this direct sale was 1¼ cents per Mcf. over the line at which the Commission is trying to hold field prices. Any reading of the Commission's opinion which does not keep this fact in mind is, we believe, bound to be incomplete.

[19] Compare the cases which have held that it was error for the Commission to refuse to consider certain factors within its power of notice. *E. g., City of Pittsburgh* v. *Federal Power Comm'n,* 237 F. 2d 741.

Congress has not given the Commission jurisdiction over direct sales. However, we cannot agree that the Commission propounded an absolute rule in this case. Examination of the opinion reveals recurrent reference to the absence of any one controlling factor; as the Commission stated, "countervailing factors suffice to *tip the balance* against the grant of the authority requested by Transco." 21 F. P. C., at 141. (Emphasis added.) It is difficult to find any indication of the flat rule mentioned by respondents in language such as this. Furthermore, if there were any lingering doubt on this point, it is dispelled by the fact that the Commission has, on many occasions, held that transportation of gas sold directly to the consumer *is* in the public interest when the reasons advanced by the applicant have been sufficiently strong. See, *e. g., Houston Texas Gas & Oil Corp.,* 16 F. P. C. 118. On this point, the Commission's actions speak louder than respondents' unsupported allegations. See *Northern Natural Gas Co.,* 15 F. P. C. 1634.[20]

Respondents also argue that the Commission is opposed to this transaction merely because the underlying sale is a direct sale not subject to the Commission's primary jurisdiction. However, a fair reading of the Commission's opinion as a whole reveals that the Commission did not exalt form over substance in an attempt to aggrandize the scope of its jurisdiction; rather, whenever the Commission discussed the nonjurisdictional nature of this sale, it tied this discussion into an analysis of one or

---

[20] Many of the cases in which the Commission has certificated the transportation of gas pursuant to direct sales are listed in Brief for Respondent Michigan Consolidated Gas Co. in Opposition to the Petition for Certiorari, pp. 24–30, *Panhandle Eastern Pipe Line Co.* v. *Federal Power Comm'n,* No. 369, 1956 Term.

the other of the substantive evils it was seeking to prevent—"inferior" use or increased prices to consumers generally.[21]

The question for consideration in this section, therefore, is whether in a § 7 proceeding the Commission may consider sales price or, more accurately, the effect the inflated price charged in one sale will have on future field prices. We have recently answered this question in favor of the Commission's jurisdiction. See *Atlantic Refining Co.* v. *Public Service Comm'n, supra,* at 391, where we stated that the Commission could decide whether:

"[T]he proposed price is not in keeping with the public interest because it is out of line or because its approval might result in a triggering of general price rises . . . ."

---

[21] The Court of Appeals agreed with respondents that certain language used by the Commission indicated that the Commission was *per se* opposed to direct sales. The Court concentrated on the passage in which the Commission stated that certification would have the adverse effect of:

"[M]aking it more difficult to meet the requirements of smaller purchasers in the event arrangements of this type become widespread." 21 F. P. C., at 399–400.

and it felt that this was tantamount to saying that:

"[O]nly pipe lines should purchase gas for only they engage in interstate transportation and thereby come under authority of the Commission." 271 F. 2d, at 953.

However, the thrust of the Commission's reasoning on this point can be better grasped by reviewing the proposition as it was argued to the Commission by its staff. The Commission's staff contended that:

"The purchase of natural gas by and transportation for the ultimate consumer, as proposed herein, may make it difficult for pipe line companies to purchase gas at *reasonable prices* for resale to other customers who require the gas for *superior domestic and commercial uses* and thus may be contrary to the public interest." (Emphasis added.)

However, respondents point out that the underlying sale in that case was a sale for resale and thus independently subject to the Commission's jurisdiction. Where such independent jurisdiction does not exist because of the bar in § 1 (b), respondents claim that the Commission's power of notice is curtailed.

This Court has never been faced with precisely this problem, but on several occasions we have been called upon to consider arguments very similar to the one advanced here. For example, in *Colorado Interstate Gas Co.* v. *Federal Power Comm'n,* 324 U. S. 581, it was held that, in fixing a rate base for the measurement of interstate wholesale rates, the Commission might take into account the value of the pipeline company's production and gathering facilities, even though the Commission had no direct jurisdiction over these facilities because of the bar in § 1 (b). The contention which was rejected in *Colorado Interstate* has a familiar ring in the present context: According to the unsuccessful litigant, when the FPC includes production and gathering facilities in a rate base, "it regulates the production and gathering of natural gas contrary to the provisions of § 1 (b) of the Act." *Id.,* at 600. Similarly, in *Panhandle Eastern Pipe Line Co.* v. *Federal Power Comm'n,* 324 U. S. 635, 646, it was said in dictum that:

> "The Commission, while it lacks authority to fix rates for direct industrial sales, may take those rates into consideration when it fixes the rates for interstate wholesale sales which are subject to its jurisdiction."

These cases, while not in themselves controlling, indicate at least that respondents' argument is overly broad. However, to decide a particular case we must return to the consideration discussed in the previous section—the Act contemplates comprehensive regulation in the public

interest and the critical inquiry is whether Congress intended state or federal authority to govern.

In the present case, the Commission was concerned with the effects this certification might have in the future on field prices generally. The Commission was attempting to consider not only the interests of consumers in New York but those in all States. To be compared with the problem before the Commission are the determinations that a consuming state commission may properly make in exercising authority over a direct sale. Certainly, the consuming State can regulate retail rates at which gas can be sold within the State. *E. g., Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n,* 332 U. S. 507. This power was recognized at the time the Act was passed, see Powell, Note, Physics and Law—Commerce in Gas and Electricity, 58 Harv. L. Rev. 1072, and it is clear that Congress excepted federal regulation of direct sales precisely for this reason. See H. R. Rep. No. 709, 75th Cong., 1st Sess. 1–2. But, in this case the Commission has not objected to the retail rate and we need not decide whether there are limits on the Commission's power in this hypothetical situation. The very nature of the present problem, entailing as it does considerations that overstep the bounds of any one State, illustrates the improbability that state commissions could or would attempt to deal with it; it seems clear that considerations of this sort are uniquely fitted for federal scrutiny. Particularly relevant in this connection is this Court's decision in *Panhandle Eastern Pipe Line Co.* v. *Public Service Comm'n,* 332 U. S. 507. In that case, it was held that a state commission may regulate retail sales, even though the gas was brought from out-of-state sources. The pipeline company argued that conflicting regulations enforced by different state bodies, particularly regulations concerned with interruption of service, might place it in an

untenable position. The Court answered this argument
by stating that:

> "There is no evidence thus far of substantial conflict
> in either respect and we do not see that the prob-
> ability of serious conflict is so strong as to outweigh
> the vital local interests to which we have referred
> requiring regulation by the states. *Moreover, if such
> conflict should develop, the matter of interrupting
> service is one largely related, as appellees say, to
> transportation and thus within the jurisdiction of
> the Federal Power Commission to control, in accom-
> modation of any conflicting interests among various
> states.*" *Id.*, at 523. (Emphasis added.)

The point is, as we have stated, that Congress did not
desire an "attractive gap" in its regulatory scheme;
rather, Congress intended to impose a comprehensive
regulatory system on the transportation, production, and
sale of this valuable natural resource. Therefore, when
we are presented with an attempt by the federal authority
to control a problem that is not, by its very nature, one
with which state regulatory commissions can be expected
to deal, the conclusion is irresistible that Congress desired
regulation by federal authority rather than nonregulation.
See *Panhandle Eastern Pipe Line Co.* v. *Federal Power
Comm'n*, 232 F. 2d 467.

Respondents' final argument on this point is that the
Commission abused its discretion in denying certification
because it took cognizance of facts *dehors* the record and
because it did not pay sufficient attention to the recorded
testimony of respondents' expert concerning air pollution.
The first objection—that the Commission erred in going
outside the record—was rejected by the Court of Appeals
and we concur in that conclusion. According to the
statute, the Commission is required to determine whether
certification is in the "present or *future* public conven-

ience and necessity." (Emphasis added.) Obedient to this command, the Commission did forecast the future and concluded that widespread direct sales at high prices would probably result in price increases. Respondents appear to be claiming that the Commission should have adduced testimonial and documentary evidence to the effect that this forecast would come true. However, we do not think that the Commission is so limited in its formulation of policy considerations. Rather, we think that a forecast of the direction in which future public interest lies necessarily involves deductions based on the expert knowledge of the agency. See *Atlantic Refining Co.* v. *Public Service Comm'n, supra,* at 391.[22] It should also be noted that there has been a considerable showing made by the petitioners and state regulatory commissions appearing as *amici curiae* to the effect that the Commission's forecast is well founded.[23] Moreover,

[22] Cf. *United States* v. *Detroit & Cleveland Navigation Co.,* 326 U. S. 236, 241, where the Court upheld the Interstate Commerce Commission's forecast of the future public convenience and necessity over an objection that there was no absolute showing that the forecast would come true.

[23] The *amicus* briefs of two California public utilities, Southern California Gas and Southern Counties Gas, reveal that the competitive bidding of California Edison Co., a large industrial user, for direct purchases in the field has already forced up the prices to domestic consumers in California. Brief *Amici Curiae* of the Southern California Gas Co. and the Southern Counties Gas Co. of California, pp. 13–14. Several other industrial users are also contemplating taking advantage of an X–20 type service. See Reply Brief for the Federal Power Commission, pp. 4–5. In fact, the record reveals that Transco has suggested the possibility of providing X–20 service to its other customers, R. 71a, and several of these customers are negotiating for such service. R. 63a–71a. It is interesting to note that an Assistant to the Vice President of Con. Ed. testified that the producers sold the gas directly to Con. Ed. with a limitation on resale because "they (the producers) were allergic to proceedings before the Federal Power Commission." R. 108a.

as a matter of common sense, it would seem difficult to deny that the channeling of vast quantities of a wasting resource into unregulated transactions at a high price will result in scarcity to other consumers and a general price increase. Cf. *Panhandle Eastern Pipe Line Co. v. Public Service Comm'n,* 332 U. S. 507, 521, n. 19.

Respondents' last point is that insufficient weight was afforded the evidence concerning air pollution. Concededly, the testimony of Con. Ed.'s expert witness, the Commissioner of the Department of Air Pollution Control in New York City, was entitled to great weight. However, as the New York Commissioner himself admitted, it was not possible for him to establish a definite relation between injury to health and the stack emissions at the Waterside station.[24] . More importantly, it was not shown that other methods—particularly the use of gas presently available to Con. Ed. under other forms of service [25]—could not be used to solve the problem. Consequently, we cannot say that the Commission acted irrationally in concluding that Con. Ed.'s proof was insufficient. See *Charleston & Western Carolina R. Co. v. Federal Power Comm'n,* 98 U. S. App. D. C. 241, 234 F. 2d 62.

Neither this Court nor the Commission holds in this case that sales to pipelines are generally more in accord with the public interest than other sales; nor do we authorize the elimination of direct sales of gas under appropriate circumstances nor the denial of a certificate

---

[24] R. 48a, 111a.

[25] At the time certification for the X–20 service was sought, Con. Ed. was using gas on an interruptible basis at a rate that averaged 78,578 Mcf. per day. A substantial amount of this gas was fired under Con. Ed.'s boilers, although not under the boilers at the Waterside station. No reason appears in the record why Con. Ed. could not have used the gas it was then receiving under its Waterside boilers to alleviate, if not solve, the air pollution problem. See R. 89a–92a.

to any arbitrarily chosen group of purchasers. All we hold is that the Commission did not abuse its discretion in considering, among other factors, those of end use, pre-emption of pipeline facilities and price in deciding that the public convenience and necessity did not require the issuance of the certificate requested. The judgment of the Court of Appeals must be

*Reversed.*

Mr. Justice Harlan, whom Mr. Justice Frank-furter and Mr. Justice Stewart join, concurring in part and dissenting in part.

The Commission's denial of a certificate for the trans-portation of this natural gas rested on a combination of three determinations: (1) the inferior "end use" of the gas, that is its use for the alleviation of air pollution result-ing from the burning of coal in the Waterside Plant of Consolidated Edison in New York City; (2) the effect of purchases such as this in enhancing future field prices of natural gas; and (3) the likely pre-emption of future pipeline transportation capacity resulting from such purchases.

Though I regard the matter as less clear than the Court does, I agree that the legislative history of the 1942 amendments to the Natural Gas Act supports the Com-mission's power to consider inferior end use as a factor in denying Transco a transportation certificate for the gas in question. However, I cannot agree that the premises on which the Commission rested its conclusions as to field prices and the pre-emption of transportation capacity are adequate to justify affirmance of its denial of a certificate.

As will be shown, those conclusions were bottomed almost entirely on the proposition that most, if not all, *direct* purchases, at least those of substantial magnitude, would be against the public interest. Since I believe that

the denial of a certificate in this case had to be premised on factors present in *this particular* transaction, I think the proper course is to remand the case to the Commission for further consideration on proper postulates.

At the outset, it is important to note the procedural context of our review. In denying a petition for rehearing, the Commission made clear that the "end use" factor was neither of "decisive" nor of "determinative" importance; inferiority of end use was but one of several factors which together, and not individually, justified denial of this certificate in the Commission's view. These other factors failing, as they do in my opinion, the denial of the certificate cannot stand.

## I.

### PREMISES OF THE COMMISSION'S DENIAL.

I think it manifest that the Commission weighed against certification the fact that the sale to Consolidated Edison was direct to a consumer and hence not subject to normal Commission regulation of sales to pipeline companies for resale.[1] The Trial Examiner referred to "The Staff's opposition" as based, among other reasons, on the fact that:

"The proposal is obviously an attempt to evade the jurisdiction of the Commission over the sale of nat-

[1] The basic reach of the Natural Gas Act, 15 U. S. C. § 717 *et seq.*, is set forth in § 1 (b), 15 U. S. C. § 717 (b):

"The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

ural gas for use in the large consuming centers of the country and thus may be contrary to the public interest; . . ."

And the Examiner referred to the Staff's argument "that this sort of non-jurisdictional activity by Consolidated Edison should be halted as an example to others who may similarly attempt to avoid regulation in this way." The same argument was repeated to the Commission itself.

That the Commission adopted this approach of viewing this particular sale as but a facet of the broader direct-sale problem is clear from the reasons it states, 21 F. P. C. 138, as weighing towards denial of the certificate. Each of the considerations of effect on field prices and distribution of field supply is worded in the plural. The Commission throughout its report speaks as if it is presently forbidding access to the producer in the field by any one except pipelines purchasing for resale. That it is not restricting itself to the denial of the particular transportation involved in the X–20 service but is instead only denying that service because of the adverse effects that would result from committing itself to regularly allowing direct purchases in the field by nonpipelines, is apparent from the following:

"[I]f we were to grant this request we would soon be confronted with many requests of the same general character . . . .

.         .         .         .         .

"How much more serious is that impact [of large demand on limited supply] when it is in the form of multiple bidders . . . .

"And how long the pipeline can continue to buy in competition with nonjurisdictional, large volume purchasers . . . is at least a question." *Id.,* p. 141.

34

In its denial of a rehearing [2] the Commission acknowledged that it considered the "adverse effects on the public" of granting this "and similar such authorizations" including "the effect of stimulating increased purchases of gas in the field by distributing companies in substitution for the present, prevalent types of interstate natural-gas services involving purchases and resales by natural-gas pipeline companies . . . ." *Id.,* p. 399.[3]

It is clear, then, that the Commission was concerned with the adverse effects it felt characterized most sales to distributing companies or consumers, rather than with anything offensive about this particular sale (excepting of course the proposed end use). What were these adverse effects of all direct sales? Two are central to the

[2] 21 F. P. C. 399.

[3] If there can be any doubt on this score, it is dissipated by the position taken by the Commission in the "Summary of Argument" in its brief in this Court:

"The threat posed by the X–20 type of arrangement to the small consumer, the person for whom the protections of the Natural Gas Act were designed, lies in its potential to establish a new, unregulated, interstate market for natural gas—by the large industrial consumer purchasing directly from the producer—which will compete for new gas supplies with the regulated market over which the Commission currently exercises jurisdiction. . . .

.        .        .        .        .

"In the Commission's view, the new market which this and further X–20 transactions would establish (1) portends definite and lasting inflationary impact on gas prices generally, (2) would probably be devoted to end-uses inappropriate to the Act's purposes, (3) would disrupt patterns of industry growth carefully evolved during 20 years of congressionally-directed regulation, and (4) would be beyond effective state regulation.

"On the basis of its judgment that these damaging probable effects outweighed both (1) Con Edison's need for the gas, and (2) the inadequately shown contribution which burning the gas as boiler fuel might make to local air pollution control, the Commission denied Transco's application for a certificate as not being required by the present or future public convenience and necessity."

Commission's opinion. First, "the authorization of this and like proposals would pre-empt for this usage capacity which would otherwise be available to meet more urgent and widely beneficial public needs . . . ." 21 F. P. C., at 141.[4]  Second, there is the effect on field prices:

> "The impact of large demand on relatively limited supply is certain enough to raise rates and field prices if only one bidder is bringing that demand to bear on the supply. How much more serious is that impact when it is in the form of multiple bidders, each attempting to reserve to itself a firm supply. Inevitably, there would be upward pressure on rate levels in the fields. We do not believe we ought to encourage such when it is unnecessary. . . ." *Ibid.*

Thus, the Commission has quite evidently asserted a power to frown upon any transaction which does not take the form of a sale to a pipeline for resale: On that basis, it was in this case, and would hereafter be, unnecessary for the Commission to decide whether a particular sale to a consumer or distributing company results in a waste of jurisdictional resources or an unwarranted boosting of field prices. Since, in the Commission's view, sales not to pipelines, as a class, generally have these unfortunate characteristics, it is sufficient that the particular transaction is one of that class. The Commission has made clear that it was the harms inherent in the form this sale took that weighed against the issuance of a transportation certificate, not the unfortunate effects of the transaction itself. I cannot agree that the Commission had discretion to adopt this position when it had available to it far less drastic alternatives.

---

[4] I agree with the Court of Appeals that this consideration ultimately depends upon the inferiority of the proposed "end use," only now the end use is to be considered in the context of limited pipeline capacity rather than limited supply of gas.

36

## II.

### POSTULATES ON WHICH THE COMMISSION SHOULD HAVE PROCEEDED.

· Without purporting to exhaust the full reach of its discretion, the premises on which the Commission, in my view, should have proceeded will be now indicated. Basically, I think it was open to the Commission to decide whether the particular transportation service before it would tend to waste gas, unduly pre-empt pipeline capacity, or raise field prices. I think the Commission can properly assert this more limited power as an incident of its transportation certificating powers.[5] It is quite true of course that Consolidated Edison need not have resorted to the Federal Power Commission if the purchase transaction had been possible without the interstate transportation of the gas in jurisdictional pipelines, since this was not a purchase of natural gas for resale. Note 1, *supra*. However, it does not follow that the Commission had to blind itself to the effects of the purchase and use of the gas when its authority to certificate the transportation of the gas was invoked. To recognize that the transaction was, as a practical matter, impossible without the use of jurisdictional facilities for the interstate trans-

---

[5] Section 7 (e), 15 U. S. C. § 717f (e), provides:

"(e) Except in the cases governed by the provisos contained in subsection (c) of this section, a certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of the Act and the requirements, rules, and regulations of the Commission thereunder, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied. . . ."

portation of the purchased gas is to acknowledge that this transportation is as integral a part of the transaction as was the sale itself. Whether the adverse effect of the transaction be a waste of a scarce resource, or pre-emption of pipeline capacity, or a substantial boosting of field prices, the transportation is as responsible for the effects as is the original sale. I see no reason why the Commission must certify, as in accord with the "public convenience and necessity," transportation which tends materially to further such undesirable results which are within the area of the Commission's legitimate concern when it is considering the public convenience and necessity of certificating a jurisdictional sale.

Assuming that it is results only made possible by jurisdictional transportation that the Commission wishes to consider, an attempted distinction between transportation and sale certification proceedings simply obscures the important question: what undesirable results are envisioned by § 1 (b) to be the concern of the States and not the concern of the Federal Power Commission? We hold in this case that the economic waste of natural gas that might otherwise be available for jurisdictional transactions ending in superior uses is such a legitimate concern. Similar considerations pertain to the pre-emption of pipeline capacity. Note 4, *supra*. Finally, we have held in *Atlantic Refining Co.* v. *Public Service Comm'n,* 360 U. S. 378, that the Commission must consider the effect on field prices for future jurisdictional sales of an excessive purchase price. Asserting power to consider these effects does not involve assuming jurisdiction over matters that Congress has reserved to the States in § 1 (b), for it does not involve protecting citizens of either the producing or consuming State against harms that local regulatory bodies have the power to prevent. These effects being the legitimate concern of the Federal Power Commission, they are no less so in a certification proceeding for trans-

portation than in such a proceeding for the sale of natural gas. Each of these effects, if materially furthered by the transportation being considered, can properly be relied upon, on a case-by-case basis, in the denial of a transportation certificate.

### III.

DEFICIENCIES OF THE COMMISSION'S REPORT.

If, as I have argued, the Commission has power to decide on an adequate record to deny a transportation certificate in part because the gas to be transported is to be used for inferior purposes or because that gas was purchased at a price adversely affecting the prices of later jurisdictional sales, I do not think there is any basis for the Commission's further claim of authority to consider as an adverse factor the mere fact that the sale was direct to a consumer or distributor. As to inferior end use or preemption of pipeline capacity, the latter being another aspect of the former, the invalidity of the Commission's claim is easily established. Once the Commission has weighed against the grant of the certificate the fact that it results in economic waste there is nothing added by the circumstance that it is also a direct sale to a consumer and the Commission's belief that most of such sales result in economic waste.

The Commission's consideration of the impact on field prices is more refined, although no more solidly grounded. The Commission did not merely consider that the price of these sales would be unregulatable and argue that therefore all sales to consumers or distributors must be forbidden. So it is not a complete answer to repeat what has just been said about the Commission's consideration of inferior "end use" and pipeline pre-emption—that those factors can be fully considered on a case-by-case basis. The Commission passed beyond the possible problem of

unregulatable prices to an economic argument, namely, that increasing even the number of theoretically regulatable bidders for gas in the field must, as a practical matter, create a difficult-to-control-and-regulate upward pressure on field prices. I consider reasonable the economics of the Commission's position,[6] but unreasonable its finding of statutory authority for the Draconian solution it proposes.

In my opinion the Commission cannot attempt to protect its legitimate interest in lower field prices by denying sale or transportation certificates to any arbitrarily chosen group of purchasers. Such whimsy is not contemplated by the statute. Is there, then, a justifying basis for discriminating against purchasers other than pipelines purchasing for resale? It cannot be the fact that the use these purchasers propose is often inferior, for the Commission can consider this factor when the occasion arises. It cannot be the fact that the effect on field prices is worse, for prices paid by both pipelines and other purchasers can be considered by the Commission when passing upon the public interest either in a sale-for-resale or in a transportation certificate proceeding. I can find no justifying basis for the distinction sought to be drawn by the Commission between pipelines and others.

To the contrary, the discrimination against nonpipeline purchasers flouts the statutory structure by permitting

---

[6] That a greater number of bidders representing the same total demand as a smaller number of bidders would exert greater upward pressure on prices is a basic hypothesis of the antitrust laws which therefore forbid buyers to group together in dealing with a seller. Just as competition is stifled and price affected by competing sellers agreeing to sell through a single agent (and therefore at a single price), price is also affected by similar action by competing buyers. The Commission conclusion on this subfactor needed no supporting evidence.

the Commission to exercise greater regulatory power over transactions with one nonjurisdictional aspect (the direct sale) than the Commission has over transactions of which both aspects (sale-for-resale and transportation) are jurisdictional. Moreover, to recognize the discrimination against direct sales that the Commission proposes in order to reduce the upward price pressure resulting from increased numbers of bidders, is to ignore the fact that the statute contemplates and provides regulation for the use of pipelines both as wholly transportation or carrier facilities. There is no indication that this "carrier" function of pipelines was to be limited to carrying for producers who would then sell in the State of destination. It also properly extends to carrying for and to wholesalers or consumers in the State of destination.[7]

These, then, in my opinion are the considerations which require a holding that it was an abuse of discretion for the Commission to hold sales to pipelines generally more in accord with the public interest than other sales. There is absolutely no rational basis, as I see it, for selecting distributing companies and consumers as the group of bidders to be sacrificed and eliminated in order to reduce the pressure toward higher field prices. There is no harmful characteristic of these bidders that is not fully shared by pipeline purchasers. Even worse, the purpose-

---

[7] Furthermore, viewing the matter realistically, the Commission must object as strenuously to a producer selling in the State of ultimate consumption as to a distributor or consumer buying in the State of production, for whether the direct sale between a producer and consumer takes place before or after the transportation of the gas is a matter easily manipulated by the parties and a matter which has no effect on the Commission's policy considerations. The upward pressure on field prices created by increasing the total number of bidders is the same whether the producer finds additional bidders in the consuming State or allows them to come to him in the field.

ful elimination of this entire class of prospective purchasers clashes with the structure of a statute that was largely motivated by a desire to reduce the power of the pipeline companies.

This conflict is most clearly manifested in the violence that the Commission's proposal does to the statute's provisions for regulation of a wholly carrier function of the pipelines, for a wholly carrier function can only be served on behalf of either producers which have already sold directly to nonpipelines or on behalf of nonpipelines which have already purchased directly from the producers. It is inescapable that forbidding all transactions involving direct sales between producers and nonpipelines eliminates any wholly carrier function for the pipelines, *i. e.,* eliminates one entire facet of the Commission's statutory jurisdiction. This statutory amputation—resulting in greater regulatory power over transactions with some non-jurisdictional aspects than there is over transactions all aspects of which are jurisdictional—is clearly outside the discretion of the Federal Power Commission.

Since the Commission regarded as necessary to its decision factors beyond its discretion to consider, the proceeding should be remanded to that agency for reconsideration. We cannot order the certificate granted, for there are results of this particular transportation which the Commission can and should properly consider but which were left unconsidered because of the erroneous broader grounds of the denial. On remand the Commission should not only consider and support with adequate fact findings the particular effects of *this* transaction on field prices and on Transco's future capacity to expand its pipeline services, but the way should be left open for it to give more careful consideration to the "end use" factor in its decision. I must say that its previous consideration of this aspect of the matter seems to me to leave much to be

42

desired, doubtless because of the over-all mistaken premises on which the Commission proceeded. In a reconsideration of the case upon correct premises, the air-pollution problem may take on a different significance, and whatever conclusions the Commission may reach on this score should in any event be accompanied with more convincing particularized findings.

For the foregoing reasons I would vacate the judgment of the Court of Appeals and remand the case to the Commission for further proceedings.