KENTUCKY WEST VIRGINIA GAS COMPANY, and Equitable Gas Company, a division of Equitable Resources, Inc., Plaintiffs,

v.

PENNSYLVANIA PUBLIC UTILITY COMMISSION, Linda C. Taliaferro, Frank Fischl, and Bill Shane, Commissioners, Federal Energy Regulatory Commission, Defendants.

Civ. A. No. 85–1514.

United States District Court, M.D. Pennsylvania.

Dec. 23, 1986.

Thomas & Thomas, Harrisburg, Pa., William A. Mogel, Ross, Marsh & Foster, Washington, D.C., for plaintiffs.

Eric N. Wise, Arlington, Va., for American Gas Assoc.

Joanne Leveque, Washington, D.C., for Federal Energy Reg. Com.

Charles Hoffman, Chief Counsel, Pa. PUC, Alphonso Arnold, Jr., Harrisburg, Pa., for defendants.

Michael Finio, Eugene Waye, Harrisburg, Pa., for Atty. Gen., intervener.

H. Kay Dailey, Robert P. Haynes, III, Harrisburg, Pa., for Consumer Advocate, intervener.

## MEMORANDUM

CALDWELL, District Judge.

### I.   *Introduction.*

Plaintiff, Equitable Gas Company (Equitable), a division of Equitable Resources, Inc., produces, purchases, transports and sells natural gas in both interstate and intrastate commerce.   As part of its business, it retails natural gas to approximately 240,000 customers in southwestern Pennsylvania.   During the twelve month period ending June 30, 1984, Equitable purchased quantities of gas from one of its suppliers, Kentucky West Virginia Gas Company (Kentucky West), a wholly-owned subsidiary of Equitable Resources, Inc., to meet the demands of its Pennsylvania customers.   In a subsequent proceeding before the Pennsylvania Public Utility Commission (PUC) Equitable sought to recover the cost of the purchased gas by increasing the rates charged to retail customers.   The PUC disallowed the requested rates because it concluded that Equitable could have obtained less expensive gas from its own production and from quantities available from other suppliers.   Equitable and Kentuckey West thereafter filed this lawsuit, contending that the PUC action violated the commerce clause [1], the supremacy

---

1.   The commerce clause authorizes Congress to "regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes."   U.S. Const. art. I, § 8, cl. 3.

clause [2], and the first, fifth, and fourteenth amendments [3], along with two federal statutes, the Natural Gas Act (NGA), 15 U.S.C. § 717 *et seq.* and the Natural Gas Policy Act (NGPA), 15 U.S.C. § 3301 *et seq.* Plaintiffs seek a permanent injunction against the PUC, prohibiting it from inquiring into Equitable's choice of natural gas from among competing gas suppliers. This request is bottomed upon the approval by the Federal Energy Regulatory Commission (FERC) of Kentucky West's gas rates as just and reasonable for the purposes of federal law. Plaintiffs also seek, among other things, a declaratory judgment that the Pennsylvania legislation, the Act of May 31, 1984, Act No. 1984–74 (hereinafter "Act 74"), enabling the PUC to disallow Equitable's purchased gas costs is unconstitutional.[4]

A hearing on the appropriateness of preliminary injunctive relief was held on October 30, 1985. Thereafter, we abstained from exercising our jurisdiction. *See Kentucky West Virginia Gas Co. v. Pennsylvania Public Utility Commission,* 620 F.Supp. 1458 (M.D.Pa.1985). The Court of Appeals for the Third Circuit reversed that determination, 791 F.2d 1111 (3d Cir.1986), and remanded the case to us for a disposition on the merits. A hearing was held for that purpose on August 21, 22 and 28, 1986 and thereafter the parties briefed the issues which are now ripe for disposition. For the reasons set forth below, we will grant judgment in favor of defendants on all of the plaintiffs' claims.[5]

## II. *Background.*

From the testimony at the hearings and the stipulation of facts that the parties have been able to agree upon, the following is the background of this litigation.[6]

As noted previously, Equitable sells natural gas at retail in southwestern Pennsylvania. It has approximately 240,000 customers in Pennsylvania which include residential and industrial users. Equitable also retails gas in West Virginia and Kentucky on a much smaller scale. Its West Virginia customers number 11,000 and its Kentucky customers approximately 4,000. Equitable's retail sales in these three states are regulated by the appropriate state administrative body; in Pennsylvania, the PUC, in West Virginia, the West Virginia Public Service Commission, and in Kentucky, the Kentucky Public Service Commission. These retail sales are not subject to FERC approval.

Equitable has three main sources of gas. First, Equitable has its own production from wells it controls in West Virginia and Pennsylvania. Second, gas is acquired from independent producers in those states under contracts with Equitable. Third, Equitable receives gas from three interstate pipelines, Kentucky West, Texas Eastern Transmission Corporation (Texas Eastern) and Tennessee Gas Pipeline Company (Tennessee).

Kentucky West, Texas Eastern and Tennessee, natural gas companies under section 1 of the NGA, 15 U.S.C. § 717, sell gas in interstate commerce. They receive supplies of gas from producers at the wellhead. FERC controls the pipelines' tariffs. That federal agency approves many differ-

**2.** The supremacy clause provides, in relevant part, as follows: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land,...." U.S. Const. art. VI, cl. 2.

**3.** U.S. Const. amend. I, V, and XIV, § 1.

**4.** The PUC also directed plaintiffs to retain separate counsel and support staffs in future appearances before the Federal Energy Regulatory Commission (FERC). Plaintiffs alleged that this action violated their first amendment right of association and to petition the government for redress of grievances as well as denied them due process. We will not dispose of this issue because the PUC may bring it to the attention of FERC for whatever disposition FERC feels is appropriate if, and when, plaintiffs disregard the PUC's directive.

**5.** We will not do so for the legal representation issue referred to in footnote 4, *supra.*

**6.** This "Background" section and the "Discussion" section which follows constitute our findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52.

ent tariffs for the sale of natural gas and the price at which gas is sold under each tariff may be different. Approval of the tariffs, or rates at which a pipeline sells gas, does not guarantee the pipeline any particular sales volume. Kentucky West sells approximately 70% of its gas to Equitable.

Equitable has long term contracts with each of its interstate pipeline suppliers. The contracts contain the following two provisions, typically included in contracts for the wholesale purchase of natural gas. One provision entitles Equitable to purchase a maximum amount of gas per day, "a maximum daily volumetric entitlement." The other provision is a "minimum commodity bill," requiring Equitable, for a portion of the period relevant to this action, to pay the full commodity charge for a minimum volume of gas regardless of whether Equitable actually needs or wants the gas.[7] A minimum commodity bill does not require Equitable to physically take the gas paid for. *See Wisconsin Gas Co. v. FERC,* 244 U.S.App.D.C. 349, 758 F.2d 669, 672 (D.C.Cir.1985) (per curiam).

The minimum commodity bill is similar to a provision pipelines have in their own contracts with producers of natural gas. Called a "take or pay" provision, it "require[s] a pipeline to take a specified percentage of the gas which it is contracturally obligated to purchase, or to pay for such gas." *Id.* at 673 n. 8 (brackets added).

As noted previously, Equitable made certain purchasing decisions during 1983 and 1984, taking from among the sources of gas available to it, a certain quantity from its affiliated pipeline, Kentucky West. On March 1, 1985, Equitable sought approval of new rates for its retail customers in Pennsylvania by filing a computation of Annual Purchased Gas Adjustment pursuant to 66 Pa.Con.Stat. § 1307(f)(1), a part of Act 74.

The PUC investigated the justness and reasonableness of the new rates pursuant to section 1307(f)(2) and under the standard promulgated in 66 Pa.Con.Stat. § 1318.[8] It concluded that Equitable had not pursued "a least cost fuel procurement policy" as required by section 1318, and that its proposed rates were accordingly not just and reasonable. Specifically, in an opinion and order, adopted August 28, 1985, the PUC concluded that Equitable, for the period betwen July 1, 1983 and June 30, 1984, had unnecessarily purchased more expensive gas from Kentucky West when it had available to it lower priced local production and its own supplies. It imputed to Equitable the purchase of the less expensive gas and disallowed the rates it had requested based upon its actual gas purchases. This action resulted in a failure to recover $14.3 million in purchased gas costs for gas already delivered to and consumed by Pennsylvania customers. The PUC also concluded for the then upcoming period between September 1, 1985 and August 31, 1986, that Equitable should increase its purchases from

---

**7.** As will be shown below, FERC has acted to prevent pipelines from recovering variable costs in minimum commodity bills. FERC also recently acted to eliminate completely the minimum commodity bill from Tennessee's contracts.

**8.** That section, which is applicable to Equitable because it has over forty million dollars in intrastate operating revenues, provides, in pertinent part, that: "[n]o rates for a natural gas distribution utility shall be deemed just and reasonable unless the commission finds that the utility is pursuing a least cost fuel procurement policy, consistent with the utility's obligation to provide safe, adequate and reliable service to its customers." In making that determination, the PUC must make specific findings, including, among others, that: "[t]he utility has taken all

prudent steps necessary to negotiate favorable gas supply contracts and to relieve the utility from terms in existing contracts with its gas suppliers which are or may be adverse to the interests of the utility's ratepayers," that "[t]he utility has taken all prudent steps necessary to obtain lower cost gas supplies on both short-term and long-term bases both within and outside the Commonwealth," and that "[t]he utility has not withheld from the market or caused to be withheld from the market any gas supplies which should have been utilized as part of a least cost fuel procurement policy." See 66 Pa. Con.Stat. § 1318(a). (brackets added). The PUC must make other specific findings when purchases have been made from an affiliate. *Id.* at subsection (b).

Texas Eastern and reduce purchases from Tennessee. Concerned about the close corporate relationship between Kentucky West and Equitable, the PUC also ordered those entities to retain separate counsel and separate support staff in Kentucky West's future FERC proceedings. This lawsuit followed.

In the meantime, Equitable has complied with the PUC Order. It has reduced its purchases from Tennessee and increased its purchases from independent gas producers in Pennsylvania and West Virginia.

## III. *Discussion.*

### A. *Act 74 Does Not Violate the Supremacy Clause.*

■ We preface our discussion of the supremacy clause claim with the following remarks by the Supreme Court on the "dilemma" often presented by federal and state regulation of utilities:

> Maintaining the proper balance between federal and state authority in the regulation of electric and other energy utilities has long been a serious challenge to both judicial and congressional wisdom. On the one hand, the regulation of utilities is one of the most important of the functions traditionally associated with the police power of the States. See *Munn v. Illinois,* 94 US [4 Otto] 113, 24 L Ed 77 (1877). On the other hand, the production and transmission of energy is an activity particularly likely to affect more than one State, and its effect on interstate commerce is often significant enough that uncontrolled regulation by the States can patently interfere with broader national interests. See *FERC v Mississippi,* 456 US 742, 755–757, 72 L Ed 2d 532, 102 S Ct 2126 [2135–36] (1982); *New England Power Co. v New Hampshire,* 455 US 331, 339, 71 L Ed 2d 188, 102 S Ct 1096 [1100] (1982).

*Arkansas Electric Cooperative Corp. v. Arkansas Public Service Comm'n,* 461 U.S. 375, 377, 103 S.Ct. 1905, 1908–09, 76 L.Ed.2d 1, 6 (1983).

We turn now to the supremacy clause claim and note that it must be judged against the following standard:

> It is a familiar and well-established principle that the Supremacy Clause, US Const, Art VI, cl 2, invalidates state laws that "interfere with, or are contrary to" federal law. *Gibbons v Ogden,* 9 Wheat 1, 211, 6 L Ed 23 (1824) (Marshall, C.J.). Under the Supremacy Clause, federal law may supersede state law in several different ways. First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. *Jones v Rath Packing Co.,* 430 US 519, 525, 51 L Ed 2d 604, 97 S Ct 1305 [1309] (1977). In the absence of express pre-emptive language, Congress' intent to preempt all state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. *Rice v Santa Fe Elevator Corp.,* 331 US 218, 230, 91 L Ed 1447, 67 S Ct 1146 [1152] (1947). Pre-emption of a whole field also will be inferred where the field is one in which "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Ibid.;* see *Hines v Davidowitz,* 312 US 52, 85 L Ed. 581, 61 S Ct 399 (1941).
>
> Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law. Such a conflict arises when "compliance with both federal and state regulations is a physical impossibility," *Florida Lime & Avocado Growers, Inc. v Paul,* 373 US 132, 142–143, 10 L Ed 2d 248, 83 S Ct 1210 [1217–18] (1963), or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v Davidowitz,* supra, [312 US 52], at 67, 85 L Ed 581, 61 S Ct 399, [at 404]. See generally *Capital Cities Ca-*

*ble, Inc. v Crisp,* 467 US 691, 698–699, 81 L Ed 2d 580, 104 S Ct 2694 [2700] (1984). *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 712–714, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714, 721 (1985); *see also Cipollone v. Liggett Group, Inc.,* 789 F.2d 181 (3d Cir.1986), *petition for cert. filed,* 55 U.S.L.W. 3364 (U.S. Oct. 6, 1986) (No. 86–563).

Plaintiffs claim that Act 74 conflicts with federal law because it permits Pennsylvania to regulate indirectly the price of Kentucky West's gas in interstate commerce. They point specifically to section 1318(d) as being unconstitutional on its face.[9] That section provides as follows:

> Other regulatory approvals.—The fact that a contract or rate has been approved by a Federal regulatory agency for interstate ratemaking purposes shall not, in and of itself, be adequate to satisfy the utility's burden of proof that gas prices and volumes associated with such contract or rate are just and reasonable for purposes of this section.

Plaintiffs claim that the statutory refusal to recognize a rate established by a federal agency is improper. We disagree. "It is well established that the courts will not invalidate a statute on its face simply because it *may* be applied unconstitutionally, but only if it *cannot* be applied consistently with the Constitution." *Robinson v. New Jersey,* 806 F.2d 442, 446 (3d Cir.1986) (emphasis in original). Section 1318(d) can be applied constitutionally because it merely recognizes explicitly what has been accepted for decades in utility regulation jurisprudence—that states may legitimately exercise authority over intrastate utility rates. *See Arkansas Electric, supra.* Hence, the refusal to accept federal approval of interstate rates is valid because Act 74 is intended to reach only intrastate rates. The use of the phrase, "just and reasonable" in both federal law, see 15 U.S.C. §§ 717c(a), 717d(a), and state law is irrelevant when the jurisdictional reach of the laws is different. Section 1318(d) is not unconstitutional on its face.

Plaintiffs and the amicus, American Gas Association, rely heavily upon *Nantahala Power And Light Co. v. Thornburg,* —— U.S. ——, 106 S.Ct. 2349, 90 L.Ed.2d 943 (1986) to buttress their contention that Act 74 violates the supremacy clause and is in conflict with the NGA.[10] In their view, the Supreme Court held in *Nantahala* that "state regulators must recognize that wholesale energy costs incurred by local utilities are reasonable and prudent as a matter of law." (Kentucky West's and Equitable's initial brief at p. 29). We find no support in *Nantahala* for this expansive reading of the opinion.

In *Nantahala,* the Nantahala Power & Light Company (Nantahala) and Tapoco, Inc. (Tapoco), wholly owned subsidiaries of Alcoa, each owned hydroelectric plants on the Little Tennessee River and surrendered all the power generated by the plants to the Tennessee Valley Authority (TVA). In

**9.** On the morning of trial plaintiffs amended their responses to include a facial attack upon 66 Pa.Con.Stat. § 1318(a). The Attorney General filed a motion to exclude the issue, which was denied at the hearing. We will deny the Attorney General's companion motion for sanctions.

There are other outstanding motions we should deal with at this juncture. The PUC and Office of Consumer Advocate have filed a motion in limine, trying to prevent relitigation of certain issues decided adversely to plaintiffs in the proceedings before the PUC. Plaintiffs oppose the motion. All parties discuss the matter in terms of the collateral estoppel and res judicata effects of the agency proceedings. Plaintiffs did introduce some testimony going to the merit of the PUC's fact-finding, but regardless of the reasons set forth in the motion in limine, we have decided not to inquire into the correctness of the PUC findings in the context of this case. Plaintiffs are challenging the very authority of the PUC, in light of federal constitutional and statutory provisions, to inquire into Equitable's purchased gas costs. Whether the PUC was correct in its factfinding is irrelevant to the inquiry we must make. Accordingly, the motion in limine will be dismissed as moot.

The PUC has also filed a motion to amend its answers to paragraphs 23 and 25 of plaintiffs' complaint. Plaintiffs have opposed this motion. We believe the motion has come too late and we will deny it.

**10.** We will, like plaintiffs, refer generally to Act 74 for convenience although plaintiffs are contesting only certain provisions of the Act.

return, both received a fixed supply of low cost "entitlement power," and Nantahala could purchase a variable amount of high cost "purchased power." Nahtahala served retail and wholesale customers. Tapoco sold all its power to Alcoa.

Certain agreements between TVA, Nantahala and Tapoco, conferred upon Tapoco 80% of the entitlement power and upon Nantahala 20%. In 1976, Nantahala filed a proposed wholesale rate increase with FERC. Upon objection by a wholesale customer, FERC determined that the allocation of entitlement power was unfair and that Nantahala should receive 22.5% of that power. FERC therefore required Nantahala to file rates which took into account FERC's allocation of the entitlement power.

Nantahala had also sought to raise its intrastate rates in North Carolina. The Utilities Commission of North Carolina used a methodology, and assumptions concerning available power, at odds with the analysis of FERC and concluded that Nantahala should calculate its costs for state ratemaking as if it received 24.5% of the entitlement power.

The Supreme Court concluded that the state Utilities Commission could not engage in this inquiry. Based upon the "filed rate doctrine," the Commission had to accept the allocation of entitlement power determined by FERC. The Court stated:

> We acknowledge that this case does not present the typical application of the filed rate doctrine, in which a middleman faces a FERC-fixed wholesale rate charged by a power supplier. In that situation, for a state ratemaking agency to disregard a FERC-filed rate would clearly be inconsistent with the exclusive federal regulatory scheme over interstate wholesale power prices. The FERC-approved rate at which the middleman purchased power would not be fully recognized as a cost in the retail market, thereby forcing the middleman to sell

power at less than its reasonable cost as determined by the federal agency.

> Here, in contrast, Nantahala both owns some of the facilities that produce the relevant electricity and sells that power to its retail customers, rather than to a distributor. But FERC's regulation of wholesale power rates nonetheless has a direct effect on Nantahala's costs of producing retail power. Nantahala has, through the NFA, contracted with TVA for the latter to control eight of Nantahala's eleven hydroelectric facilities, and that arrangement was approved by FERC in the course of rate proceedings over which FERC clearly had exclusive jurisdiction. FERC also examined the AA, a document filed in conjunction with the same proceeding, and concluded that the reasonable allocation of entitlement power was to give 77.5% of that power to Tapoco and 22.5% of that power to Nantahala. From Nantahala's point of view, then, it is in a situation quite similar to that of a purchaser of wholesale power at FERC-approved rates: Nantahala is entitled to include only a certain, FERC-specified amount of low-cost entitlement power among the sources of power from which it can draw in providing retail power. The fact that NCUC is setting retail rates does not give it license to ignore the limitations that FERC has placed upon Nantahala's available sources of low-cost power.

*Id.* at ——, 106 S.Ct. at 2358, 90 L.Ed.2d at 956.

The case at bar is easily distinguishable. Neither of the plaintiffs in this case is in the situation in which Nantahala found itself. Kentucky West is an interstate pipeline and makes no retail sales subject to PUC jurisdiction. Equitable, for the purposes of this action, is an intrastate retailer of natural gas which has available to it several sources of natural gas,[11] one of which is Kentucky West. No single entity, simultaneously serving as wholesaler and

---

**11.** Equitable does make certain sales which are subject to FERC jurisdiction. *See Equitable Gas*  *Co.,* 26 FERC ¶ 61,325 (1984).

retailer, is subject to the potential of conflicting orders from federal and state agencies. There is accordingly no risk of "trapped costs" and the filed rate doctrine is inapplicable here.

That *Nantahala* cannot control this case is made clear by the following remarks from the opinion:

> [T]he North Carolina Supreme Court erred in relying on cases treating the reasonableness of purchasing from a particular source of, rather than paying a particular rate for, FERC-approved power. See *Pike County Light & Power Co. v Pennsylvania Public Utility Comm'n*, 77 Pa Commw 268, 273–274, 465 A.2d 735, 737–738 (1983); *Kansas-Nebraska Natural Gas Co. v State Corp. Comm'n*, 4 Kan App 2d 674, 679–680, 610 P2d 121, 127 (1980). Without deciding this issue, we may assume that a particular *quantity* of power procured by a utility from a particular source could be deemed unreasonably excessive if lower-cost power is available elsewhere, even though the higher-cost power actually purchased is obtained at a FERC-approved, and therefore reasonable, *price*.

*Id.* at ——, 106 S.Ct. at 2360, 90 L.Ed.2d at 958 (emphasis in original) (brackets added). This quotation generally describes the situation in the instant case. While we do not believe, as defendants urge upon us, that *Nantahala* thereby supports their position here, it certainly indicates that *Nantahala* does not control this case.

Plaintiffs also rely upon *Northern Natural Gas Co. v. State Corporation Comm'n*, 372 U.S. 84, 83 S.Ct. 646, 9 L.Ed.2d 601 (1963) and *Transcontinental Gas Pipe Line Corp. v. State Oil and Gas Board*, 474 U.S. 409, 106 S.Ct. 709, 88 L.Ed.2d 732 (1986). These cases, too, are distinguishable. Both of them dealt with a state regulation requiring an interstate pipeline to take gas from a common field on a *pro rata* basis from all those having an ownership interest in the field. The Court in *Transcontinental* relied upon *Northern Natural* to strike down the Mis-

sissippi regulation at issue there. It quoted the crucial language from *Northern Natural* as follows:

> The danger of interference with the federal regulatory scheme arises because these orders are unmistakably and unambiguously directed at *purchasers* who take gas in Kansas for resale after transportation in interstate commerce. In effect, these orders shift to the shoulders of interstate purchasers the burden of performing the complex task of balancing the output of thousands of natural gas wells within the State.... Moreover, any readjustment of purchasing patterns which such orders might require of purchasers who previously took unratably could seriously impair the Federal Commission's authority to regulate the intricate relationship between the purchasers' cost structures and eventual costs to wholesale customers who sell to consumers in other States.

*Id.* at ——, 106 S.Ct. at 715, 88 L.Ed.2d at 742–43 (quoting *Northern Natural*, 372 U.S. at 92, 83 S.Ct. at 646, 9 L.Ed.2d at 601) (emphasis in *Northern Natural*).

The court then identified the bases under which preemption was justified in *Northern Natural*:

> Northern Natural's finding of pre-emption thus rests on two considerations. First, Congress had created a comprehensive regulatory scheme, and ratable-take orders fell within the limits of that scheme rather than within the category of regulatory questions reserved for the States. Second, in the absence of ratable-take requirements, purchasers would choose a different, and presumably less costly, purchasing pattern. By requiring pipelines to follow the more costly pattern, Kansas' order conflicted with the federal interest in protecting consumers by ensuring low prices.

*Id.* at ——, 106 S.Ct. at 715–14, 88 L.Ed.2d at 743.

Clearly, none of these considerations are present here. The state agencies in the above cases were requiring interstate pipelines to take volumes of gas from a state

field and to place it in interstate commerce regardless of market forces and whether the pipeline would have purchased the gas as a business decision. Here, the PUC has focused on an intrastate retailer and its options from among several pipeline suppliers to satisfy the retailer's duty to Pennsylvania consumers. The scheme is within the category of regulatory questions reserved for the states and by imputing the purchase of lower cost gas to Equitable, admittedly by hindsight, is in accord with the federal interest in ensuring low prices for consumers.

A review of the Pennsylvania legislation under the supremacy clause standard of review indicates that it does not conflict with the NGA.

The Natural Gas Act of 1938 granted FPC broad powers "to protect consumers against exploitation at the hands of natural gas companies." *FPC v Hope Natural Gas Co.* 320 US 591, 610, 88 L Ed 333, 349, 64 S Ct 281 [291] (1944). See *FPC v Transcontinental Gas Pipe Line Corp.* 365 US 1, 19, 5 L Ed 2d 377, 389, 81 S Ct 435 [445] (1961); *Sunray Mid-Continent Oil Co. v FPC*, 364 US 137, 147, 4 L Ed 2d 1623, 1631, 80 S Ct 1392 [1398] (1960). To that end, Congress "meant to create a comprehensive and effective regulatory scheme," *Panhandle Eastern Pipe Line Co. v Public Service Comm'n*, 332 US 507, 520, 92 L Ed 128, 139, 68 S Ct 190 [197] (1947), of dual state and federal authority. Although federal jurisdiction was not to be exclusive, FPC regulation was to be broadly complementary to that reserved to the States, so that there would be no "gaps" for private interests to subvert the public welfare. This congressional blueprint has guided judicial interpretation of the broad language defining FPC jurisdiction, and "when a dispute arises over whether a given transaction is within the scope of federal or state regulatory authority, we are not inclined to approach the problem negatively, thus raising the possibility that a 'no man's land' will be created. Compare *Guss v Utah Labor Board*, 353 US 1 [1 L Ed 2d 601, 77 S Ct

598]. That is to say, in a borderline case where congressional authority is not explicit we must ask whether state authority can practicably regulate a given area and, if we find that it cannot, then we are impelled to decide that federal authority governs." *FPC v Transcontinental Gas Pipe Line Corp.*, supra, at 19–20, 5 L Ed 2d at 390 [81 S.Ct. at 445].

*FPC v. Louisiana Power & Light Co.*, 406 U.S. 621, 631, 92 S.Ct. 1827, 1833–34, 32 L.Ed.2d 369, 379–80 (1972). See also *Public Service Comm'n v. FERC*, 610 F.2d 439 (6th Cir.1979); *Clark v. Gulf Oil Corp.*, 570 F.2d 1138 (3d Cir.1977), *cert. denied sub nom.*, *Philadelphia Gas Works v. Gulf Oil Corp.*, 435 U.S. 970, 98 S.Ct. 1611, 56 L.Ed.2d 62 (1978).

The NGA explicitly preserves state regulation of retail intrastate sales. Section 1(b), 15 U.S.C. § 717(b), provides as follows:

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural gas companies engaged in such transportation and sale, but shall not apply to any other sale or transportation of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

In accord with this section, the Supreme Court has affirmed the principle that the NGA excluded federal jurisdiction over "direct consumer sales" within a state. *Panhandle Eastern Pipe Line Co. v. Public Service Comm'n*, 332 U.S. 507, 519 n. 15, 68 S.Ct. 190, 196 n. 15, 92 L.E. 128, 139 n. 15 (1947). And that is, of course, what the PUC was regulating when Equitable came before it in the section 1307(f) proceedings.

We can conclude from the foregoing that the state legislation does not fail the first three parts of the supremacy clause test. Congress did not expressly preempt state law on the subject. To the contrary, it

expressly preserved areas of state concern for state control. *See Panhandle, supra.* Nor can preemption be inferred from the scheme of federal regulation. It does not comprehensively govern the field of utility regulation. Rather, it was meant to be complementary to state control. Finally, the federal interest, at least at this time, cannot be said to be so dominant, given the historical right of the states to exercise police power over utilities, *see Arkansas Electric, supra,* to assume that the federal system must preclude enforcement of state law.

The only remaining factors are whether compliance with both federal and state regulations is a physical impossibility and whether state law stands as an obstacle to the full purposes and objectives of Congress.

Plaintiffs make no claim of physical impossibility but assert that Act 74 stands as an obstacle to the accomplishment and execution of certain provisions found in the NGPA. The following brief synopsis of what Congress intended to accomplish by enacting the NGPA will serve as a background for plaintiffs' claims.

In 1978, Congress altered the regulatory scheme for natural gas by enacting the NGPA. In order to provide incentives for increased gas production, Congress partially deregulated the wellhead prices producers could charge for gas. The price of some categories of gas was completely exempted from all federal regulation within the year. Price controls were phased out gradually in other categories: the NGPA eliminated the Commission's ratemaking authority over "first sales" of natural gas immediately, 15 U.S.C. § 3431(a)(1) (1982), and substituted statutorily defined "maximum lawful prices" to act as ceilings during the interim period, *id.* §§ 3312–3319.

Interstate pipelines, however, unlike producers, remained subject to regulation by the Commission, which, with one major exception, continues to scrutinize each pipeline's costs and to allow recovery in a pipeline's rates only of costs that are "prudently" incurred. In order to coordinate continued regulation of pipelines with deregulation of wellhead prices, Congress created an exception to pipeline regulation for gas acquisition costs, which, on average, account for about 90% of pipeline operating and maintenance costs. Section 601 of the NGPA replaced the "cost-of-service" analysis and provides that any amount paid for a wellhead purchase shall be deemed just and reasonable if the category of gas is deregulated or if the price does not exceed the maximum lawful price established by the NGPA. 15 U.S.C. § 3431(b) (1982). The Commission may not deny recovery of a pipeline's costs for purchasing gas if it meets this statutory definition of just and reasonable "except to the extent the Commission determines that the amount paid was excessive due to fraud, abuse, or similar grounds." *Id.* § 3431(c)(2).

*Office of Consumers' Counsel v. FERC,* 783 F.2d 206, 213–14 (D.C.Cir.1986) (footnotes omitted).

Plaintiffs', citing *Public Service Comm'n v. Mid-Louisiana Gas Co.,* 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983), claim that Pennsylvania is denying the pass-through permitted by 15 U.S.C. § 3431(c)(2), section 601(c)(2) of the NGPA. They contend that Kentucky West is entitled to pass through increases of wellhead prices it has incurred from passage of NGPA. This position is correct as a general statement of the law but it cannot provide support for the further claim, in essence, that Equitable's purchase of Kentucky West gas cannot be reviewed by the PUC.

The PUC did not disallow any FERC approved rate or any rate FERC must accept as a consequence of the NGPA. It accepted all of those rates as they appeared in Equitable's suppliers' cost structures. It simply chose from among all of those competitors, the gas supply that, in its view, would have resulted in the lowest cost to Equitable. The NGPA does not guarantee a pipeline that it will be able to

sell its gas nor does it insulate from scrutiny a local distributor's decision to buy gas from among competing pipelines. This would be a different case if the PUC had decided to approve the purchase of Kentucky West gas but had refused Equitable a pass-through of a certain portion of the FERC approved rate. Here, purchases from Kentucky West had never been approved and there is no requirement in federal law requiring local regulatory approval of a distributor's purchasing decisions. For the same reasons, we must reject plaintiffs' argument based upon Title II of the NGPA, 15 U.S.C. §§ 3342–48.

Plaintiffs' reliance upon another provision of the NGPA must also be rejected. They point to section 602(a), 15 U.S.C. § 3432(a), which permits a state "to establish or enforce any maximum lawful price for the first sale of natural gas in such State" and argue from it that Pennsylvania is illegally trying to regulate the first sale of natural gas in other states, contrary to the permissible limitations of the NGPA. These sales are purchases by Kentucky West in Kentucky and Virginia. This argument must fail because, again, Pennsylvania is merely regulating Equitable's purchases from competing suppliers and the NGPA does not guarantee Kentucky West sales of its gas to any purchaser.

We also find significant for the supremacy clause issue FERC's attitude toward state regulation of matters which have come before FERC for its approval. FERC has recognized that, while it has authority to approve rates for federal purposes, state regulatory agencies still have authority to determine if the utility's action was prudent in light of the agency's responsibilities to the state's consuming public. *See Southern Company Services, Inc.,* 26 FERC ¶ 61,360 (1984); *Pennsylvania Power and Light Co.,* 23 FERC ¶ 61,006 (1983); *Philadelphia Electric Co.,* 15 FERC ¶ 61,-264 (1981). *Southern Company Services, Inc.,* illustrative. In that case, a settlement contract came before FERC for approval. The City of Lafayette opposed it on the ground that it imposed certain un-

necessary costs on one of the utilities. Rejecting the argument, FERC stated:

> Lafayette complains that GSU's contract with Southern Companies requires GSU to purchase a certain amount of power when GSU's own avoided costs of generation are greater than the cost of purchases from Southern Companies and precludes GSU from buying from other less costly sources. This preference issue is irrelevant to this case because the Commission is not empowered to disapprove or modify a power sales agreement on the grounds that the buyer may not be making the best possible deal. As we held in another case involving Southern Companies, the question of the prudence of a utility's power purchases is properly an issue in the buying utility's rate case where it seeks to pass the costs of its purchased power on to its ratepayers. If and when GSU make a rate filing reflecting its costs under these contracts, any interested party may intervene and challenge those costs.

*Id.,* ¶ 61,360 at 61,795 (footnotes omitted).

In this regard, FERC's actions on a case-by-case basis are analogous to agency comments in federal regulations expressly setting forth an agency's attitude toward state regulation of the same area. In *Hillsborough County, supra,* the appellee, Automated Medical Laboratories, challenged Hillsborough County's ordinance dealing with blood donations as conflicting with the Food and Drug Administration's regulations in the same area. In rejecting the supremacy clause claim, the Supreme Court relied, in part, on the federal agency's statement accompanying the promulgation of the federal regulations in 1973 as follows: "[t]hese regulations are not intended to usurp the powers of State or local authorities to require plasmapheresis procedures in their localities." 471 U.S. at 714, 105 S.Ct. at 2375, 85 L.Ed.2d at 722. The Court found this to be the attitude of the FDA even after the federal regulations had been amended to broaden their coverage. Responding to a claim that the county ordinance would reduce the supply of plasma, the Court stated:

Finally, the FDA possesses the authority to promulgate regulations pre-empting local legislation that imperils the supply of plasma and can do so with relative ease. See supra, at 713 [105 S.Ct. at 2375]. Moreover, the agency can be expected to monitor, on a continuing basis, the effects on the federal program of local requirements. Thus, *since the agency has not suggested that the county ordinances interfere with federal goals,* we are reluctant in the absence of strong evidence to find a threat to the federal goal of ensuring sufficient plasma.

Our analysis would be somewhat different had Congress not delegated to the FDA the administration of the federal program. Congress, unlike an agency, normally does not follow, years after the enactment of federal legislation, the effects of external factors on the goals that the federal legislation sought to promote. Moreover, it is more difficult for Congress to make its intentions known—for example by amending a statute—than it is for an agency to amend its regulations or to otherwise indicate its position.

In summary, given the finding of the District Court, the lack of any evidence in the record of a threat to the "adequacy" of the plasma supply, and the significance that we attach to the lack of a statement by the FDA, we conclude that the Hillsborough County requirements do not imperil the federal goal of ensuring sufficient plasma.

*Id.* at 720–22, 105 S.Ct. at 2379–80, 85 L.Ed.2d 726–27 (footnote omitted) (emphasis added). Similarly, based upon FERC's attitude as expressed in previous orders, and its ability to monitor state action in this complex area, we are reluctant to find a supremacy clause violation.

We think that FERC's posture in this litigation also counsels against declaring the Pennsylvania legislation void on supremacy clause grounds. FERC was named a defendant in this suit but chose not to participate in any way even when it

was noted by the court of appeals that "the final determination of the present case hinges in large part on questions involving the extent of FERC's jurisdiction under the NGA and NGPA, questions peculiarly within the Commission's competence ..." *Kentucky West, supra,* 791 F.2d at 1118. The Court of Appeals also stated that FERC should be given an opportunity to respond. Yet in the face of plaintiffs' strenuously argued claim that the PUC was encroaching upon FERC's exclusive jurisdiction, FERC has simply filed a letter indicating only its intention to possibly participate on appeal, as it would normally do when not being sued for its own action. FERC can defer to state commissions when it is not inconsistent with national policy. *General Motors Corp. v. FERC,* 198 D.C. App. 206, 613 F.2d 939 (D.C.Cir.1979). Without the benefit of a brief from FERC we cannot be absolutely sure of our conclusion, but FERC's passive attitude in this litigation indicates that FERC does not perceive state regulation as hampering federal goals in the natural gas area, and that it has, in any event, deferred to state commissions in this area.

We conclude that Act 74 and the PUC order issued pursuant to its authority do not violate the supremacy clause, and we note our agreement with the rationale of the Pennsylvania Commonwealth Court on this issue. *See Pike County Light and Power Co. v. Pennsylvania Public Utility Comm'n,* 77 Pa.Cmwlth. 268, 465 A.2d 735 (1983).

B. *Act 74 Does Not Violate the Commerce Clause.*

1. *The Legislative History Does Not Show Enactment For Purposes of Economic Protectionism..*

■ Plaintiffs claim that Act 74 violates the commerce clause because the legislative history shows an intent to protect Pennsylvania's economy at the expense of other states. State legislation which discriminates in that way is unconstitutional. As stated by the Supreme Court in *City of Philadelphia v. New Jersey,* 437 U.S. 617,

623–24, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475, 481 (1978):

> The opinions of the Court through the years have reflected an alertness to the evils of "economic isolation" and protectionism, while at the same time recognizing that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people. Thus, where simple economic protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected. See, e.g., *H.P. Hood & Sons, Inc. v Du Mond* [336 U.S. 525, 537–538, 69 S.Ct. 657, 665, 93 L.Ed. 865 (1949)] supra, *Toomer v Witsell*, 334 US 385, 403–406, 92 L Ed 1460, 68 S Ct 1156 [1165–67]; *Baldwin v G.A.F. Seelig, Inc.* [294 U.S. 511, 527, 55 S.Ct. 497, 502, 79 L.Ed. 1032 (1935)] supra; *Buck v. Kuykendall*, 267 US 307, 315–316, 69 L Ed 623, 45 S Ct 324 [325–26], 38 ALR 286. The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce at a State's borders. Cf. *Welton v Missouri*, 91 US [1 Otto] 275, 23 L Ed 347.

Plaintiffs find this intent to protect the Pennsylvania natural gas business in the words of State Representative William Lloyd, one of the sponsors of the law:

> On the question of shut-in gas, I know there are a lot of members in this chamber who have constituents who would like to be selling gas to the utility companies and the utility companies will not buy it. If this bill passes, the utility companies are going to be under greater pressure to buy that Pennsylvania shut-in gas, which is going to be a good deal for Pennsylvania consumers as well as a good deal for the Pennsylvania oil and gas fields.

Pa.Legis.J. House at 1975 (Dec. 5, 1983). They also point to another sponsor, Representative Charles Laughlin who said:

> I think the People's Gas Company ... is an outstanding example of drilling for gas in the State of Pennsylvania, where approximately 30 percent of their supply is delivered from wells here in Pennsylvania, not supplied by long-distance pipeline, not supplied on "take-or-pay" contracts at accelerated prices.
>
> Let us look also at the possibility that this bill creates and the incentive it creates for those companies to drill in the State of Pennsylvania.
>
> [I] believe that Pennsylvania, as well as a lot of companies such as People's that have drilled here, has a considerable amount of gas underground that can be found, and it can be found at a much lower price than what they are talking about in the Gulf of Mexico and the transportation costs that are added to it ... and, this legislation reaches out to [interstate] pipelines. It reaches out to the transmission companies.

Pa.Legis.J. House at 1973 (Dec. 5, 1983).

We cannot accept these remarks as probative of an unconstitutional intent. Remarks of an individual legislator are not binding as to legislative intent, *Hoffman v. Pennsylvania Crime Victims' Compensation Board*, 46 Pa.Cmwlth. 54, 57 n. 2, 405 A.2d 1110, 1112 n. 2 (1979).[12] Additionally, these remarks were not joined in by the other co-sponsors or other members of the Pennsylvania General Assembly. Moreover, the history is inconsistent.[13] Elsewhere, Representative Kukovich stated that:

> Basically, when we vote for this legislation, we are doing three things: We are abolishing an automatic pass-on; we are

---

**12.** We believe we should follow statutory construction rules of the state in construing a state statute even though a federal question is involved. *See Exxon Corp. v. Eagerton*, 462 U.S. 176, 180 n. 3, 103 S.Ct. 2296, 2300 n. 3, 76 L.Ed.2d 497, 504 n. 3 (1983). In any event, our analysis would be the same if we followed federal statutory construction rules. *See Chrysler*

*Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979).

**13.** Thus, this case is distinguishable from *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), relied upon by plaintiffs, which, in any event, did not rely upon remarks of an individual legislator but upon a state senate report on the legislation at issue.

forcing natural gas companies to provide more disclosure to the PUC; and generally the third thing is to try to set up a system in rate filings where we are going to put pressure on our 43 gas utilities in this State to buy the least costly gas. We are going to force them through HB 132 to put pressure on down the line to get the cheapest gas possible. That is the single most important thing we can do as legislators in the State of Pennsylvania to bring some reasonable fiscal practices to the purchase of natural gas and the cost of gas utility bills in this State. I think it is imperative that we vote for this legislation and do one of the most important things we can for the utility consumer in this State in this session of the General Assembly.

*Id.* at 1971.

The thrust of these comments is consumer protection. And Representative Robert Freeman stated that Act 74 would require "gas companies to buy the cheapest possible gas." *Id.* at 1973. He made no reference to helping Pennsylvania producers. The comments of the latter two legislators relate to protecting the Pennsylvania consumer of natural gas, a permissible state interest.

### 2. *Act 74 Does Not Unconstitutionally Burden Interstate Commerce.*

Since we have concluded that Act 74 pursues a legitimate state purpose, we may evaluate it under the following commerce clause standard.

Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well

with a lesser impact on interstate activities.

*City of Philadelphia, supra,* 437 U.S. at 624, 98 S.Ct. at 2535, 57 L.Ed.2d at 482 (quoting *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 844, 25 L.Ed.2d 174, 178 (1970)).

Plaintiffs presented the following evidence concerning Act 74's effect upon interstate commerce. Joseph Ramsey, vice-president of rates and strategic planning for Tennessee, testified that Tennessee services 104 customers in 21 states. When one customer, as Equitable has done here, reduces its take from Tennessee's system, certain problems could occur. First, while a reduction in take by one customer, even of a large magnitude, can be handled, if the customer would want to increase its purchases later, insufficient notice could result in temporary operational problems affecting other customers.

There are also financial implications. Tennessee has a large exposure for take or pay costs. If Equitable reduces its purchases from Tennessee, this will increase the latter's take or pay costs which may have to be charged to Tennessee's other customers. Similarly, fixed costs which could be attributed to Equitable, would have to be spread over a smaller customer base, causing these customer costs to go up. Plaintiffs also claim that the PUC order will make it more difficult to acquire new gas reserves. In all, Tennessee's customers in 21 states will be affected. Witnesses spoke of similar problems for Kentucky West and Texas Eastern. Finally, local producers in eastern Kentucky and western Virginia may have to shut-in their wells. This is because a smaller volume of gas going to Equitable will cause Kentucky West to reduce its purchases from local producers.

In disagreeing with plaintiffs' argument, defendants assert that plaintiffs' evidence is speculative and inconclusive. Additionally, the impact on interstate commerce is negligible, and acceptable in any event, given the legitimate state goal served by Act 74. Further, the Pennsylvania law is actu-

ally consistent with federal policy on interstate gas sales.

We agree with defendants' position. First, testimony relied upon by plaintiffs is too speculative to support the claim that the PUC Order will unconstitutionally affect interstate commerce. Mr. Ramsey's testimony was conditional. He spoke of what may happen rather than of what will happen. We think the testimony of the other witnesses essentially suffers from the same defect despite being put in more positive terms. Second, we think the predictions of the dire consequences which would befall interstate commerce in natural gas are overstated in light of FERC's consideration of the same problems in Order 380, 27 FERC ¶ 61,318, 49 Fed.Reg. 22, 778 (1984).[14]

In Order 380, FERC eliminated the recovery of purchased gas costs by a pipeline for gas not taken by the buyer. It did so despite comments on the Order which were similar to those raised by plaintiffs in this action. Thus, it was claimed before FERC that elimination of the purchased gas costs would leave pipelines with no way to recover contractural obligations for take-or-pay costs owed to its suppliers. But FERC recognized that take-or-pay levels can be renegotiated and Tennessee has acknowledged in this action that it has been, in fact, attempting to renegotiate its take-or-pay commitments.

Additionally, plaintiffs' claim of curtailment problems if a customer decreases, and then later increases, its demand for gas does not appear to be likely since the customer's new pipeline may well increase its supply of gas to meet the new demand placed upon it. This would reduce the likelihood of shifts back to the old pipeline. In any event, FERC has procedures whereby gas can be shifted from one pipeline to another to prevent curtailment. *See generally* FERC Order 380, 26 FERC ¶ 30,571 at 30,968 and note 42. And, in connection with Equitable's argument that certain portions of its territory can only be reached by Tennessee's pipeline, any attempted abandonment by Tennessee would be subject to FERC approval.

FERC Order 380 provides us with a significant and in-depth statement of FERC's current attitude toward how the national market for natural gas should be regulated and supports our conclusion here that Act 74 should not be struck down on the basis of the present record.[15] The history of natural gas regulation in this country shows that the problem is a complex one and that the solutions of the past were never satisfactory for long. *See Transcontinental Gas Pipe Line Corp., supra; Public Service Commission v. Mid-Louisiana Gas Co.,* 463 U.S. 319, 103 S.Ct. 3024, 77 L.Ed.2d 668 (1983). The most recent Congressional attempt at providing reasonably priced and adequate supplies of gas to consumers is the NGPA, which attempts to introduce traditional market-type incentives to the natural gas area.

In accord with the NGPA, Order 380 is one attempt by FERC to carry the notion of price sensitivity into contractural arrangements between producers, pipelines and distributors—arrangements which tra-

---

**14.** Plaintiffs have also asserted, in advancing their claim of economic detriment to Equitable, that the disallowance of the $14.3 million in purchased gas costs has reduced Equitable's return on its property to zero in violation of its due process rights. *See Bluefield Waterworks & Improvement Co. v. Public Service Comm'n,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923). The PUC disputes that the calculation must be based on Equitable's property. Rather, since Equitable is a division of Equitable Resources, Inc., the latter company's assets provide the basis for determining return on equity. We need not decide this issue because we accept the PUC's further argument that a regulated company cannot make a due process claim when the prudence of its expenditures is at issue. *See Butler Township Water Comm'n v. Pennsylvania Public Utility Comm'n,* 81 Pa.Cmwlth. 40, 473 A.2d 219 (1984) (en banc). *See also generally D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Comm'n,* 151 D.C.App. 223, 466 F.2d 394, 418–23 (D.C.Cir.), *cert. denied,* 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972).

**15.** Order 380 was affirmed in material part in *Wisconsin Gas Co. v. FERC,* 770 F.2d 1144 (D.C. Cir.1985), *cert. denied sub nom Transwestern Pipeline Co. v. FERC,* — U.S. ——, 106 S.Ct. 1968, 90 L.Ed.2d 653 (1986).

ditionally permitted the pass-through of purchased gas costs by pipelines. In disallowing an automatic pass-through, FERC hoped to create pressure throughout the entire system for distribution of gas based on market forces. In so doing, FERC noted that some pipelines and distributors have attempted "to pursue a least-cost gas purchasing policy." Significantly, it also noted that "some states have mandated such an approach." 26 FERC ¶ 30,571 at 30,964. And, FERC in previous actions had encouraged utilitites to adopt such a policy. Thus, it is significant that FERC has not disapproved of state action in this regard or questioned the jurisdiction of a state to pursue such a goal.

Under these circumstances, Act 74 dovetails nicely with the current federal attitude and accomplishes at the intrastate retail level what FERC is attempting to do at the interstate level. The PUC's action may have some affect upon interstate commerce but we conclude that it is only incidental and that the legitimate local purpose clearly outweighs any burden upon interstate commerce. Indeed, Act 74 serves the federal interest as well. Moreover, this state interest cannot be promoted with a lesser impact on interstate commerce since, as noted previously, FERC has refused to take into account in its own proceedings the interests asserted by Pennsylvania. *Massachusetts v. United States,* 729 F.2d 886 (1st Cir.1984), cited by the Amicus in support of its claim that the PUC should avail itself of FERC proceedings to protect Pennsylvania consumers, is distinguishable because there the challenged practice was subject to the regulatory jurisdiction of FERC, not Massachusetts. And FERC was perfectly willing to adjudicate Massachusetts's claim once the state complied with proper statutory procedural requirements.

The PUC's action does not simplistically favor in-state gas producers over producers from other states. Hence, the situation is different from *Transcontinental, supra,* or *Northern Natural, supra,* relied upon by plaintiffs. Rather, the PUC has operated evenhandedly to effectuate a legitimate local interest, based upon a statute which requires that a distributor pursue a least cost fuel procurement policy regardless of where the gas is obtained. Therefore, we believe that defendants may justifiably rely upon *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978), to support their contention that interstate commerce has not been unconstitutionally affected or burdened here. In *Exxon Corp.,* Maryland passed a law prohibiting a producer or refiner of petroleum products from operating a retail service station within the state. Upholding the law against a commerce clause challenge, the Supreme Court stated:

As the record shows, there are several major interstate marketers of petroleum that own and operate their own retail gasoline stations. These interstate dealers, who compete directly with the Maryland independent dealers, are not affected by the Act because they do not refine or produce gasoline. In fact, the Act creates no barriers whatsoever against interstate independent dealers; it does not prohibit the flow of interstate goods, place added costs upon them, or distinguish between in-state and out-of-state companies in the retail market. The absence of any of these factors fully distinguishes this case from those in which a State has been found to have discriminated against interstate commerce. See, e.g., *Hunt v Washington Apple Advertising Comm'n,* 432 US 333, 53 L Ed 2d 383, 97 S Ct 2434; *Dean Milk Co. v Madison,* 340 US 349, 95 L Ed 329, 71 S Ct 295. For instance, the Court in Hunt noted that the challenged state statute raised the cost of doing business for out-of-state dealers, and in various other ways, favored the in-state dealer in the local market. 432 US, at 351–352, 53 L Ed 2d 383, 97 S Ct 2434. No comparable claim can be made here. While the refiners will no longer enjoy their same status in the Maryland market, in-state independent dealers will have no competitive advantage over out-of-state dealers. The fact that the burden of a state regulation

falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce. *Id.* 437 U.S. at 125–26, 98 S.Ct. at 2214, 57 L.Ed.2d at 100 (footnotes omitted).

In the instant case, the statute merely requires the utility to pursue a least cost fuel procurement policy. It requires no purchases from in-state producers except to the extent that the local producer is selling the least cost fuel. Because the statute does not categorize in terms of local producers and out-of-state producers, it does not violate the commerce clause.

We therefore conclude it is irrelevant that the PUC order penalized Equitable for purchasing from Kentucky West rather than from Pennsylvania producers. The disallowance of purchases from Kentucky West was not accomplished to favor these producers. The order also shifted purchases from one interstate pipeline, Tennessee, to another interstate pipeline, Texas Eastern. Moreover, the PUC order would also have benefitted local production in West Virginia. We do not believe that the mere showing that in one particular proceeding the PUC believed some purchases should have been made from in-state suppliers is sufficient to establish the improper aim of the law. The PUC's order did not unconstitutionally affect interstate commerce.

We also conclude that the "Balkanization" argument is too speculative to accept at this time. Plaintiffs speak only of the inevitability of other states passing similar laws, but they have not been able to point to any other state regulatory proceeding which has resulted in an actual conflict with the PUC order. They do point to West Virginia proceedings in which they claim the West Virginia Public Service Commission concluded that Equitable had pursued a least cost fuel procurement policy. However, the circumstances were not shown to be the same as in the Pennsylvania case. Additionally, while it is true that the West Virginia Commission concluded that Equitable could not find dependable, lower-priced supplies of natural gas, in accordance with the requirements of West Virginia law, other than those purchased, it did require Equitable to make a more diligent effort in the future. (Plaintiffs' Exhibit 8). We are reluctant to conclude at this time that "Balkanization" requires us to strike down Act 74.[16]

Since the passage of the NGPA, the interstate marketing of natural gas has obviously undergone great change. If the issuance of conflicting orders by state regulatory agencies eventually becomes a problem in the interstate market, FERC will undoubtedly intervene to protect that market. We think that plaintiffs' claim of injury here is in a similar posture to the one raised in *Federal Power Commission v. Texaco, Inc.*, 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974). Parenthetically, that case also answers plaintiffs' claim that Act 74 unfairly subjects Equitable to hindsight review of its gas purchases. In *Texaco*, pipelines and large producers challenged a Federal Power Commission (FPC) order which indirectly regulated the rates charged by small producers. This occurred in FPC reviews of the costs of gas purchases by large producers and pipelines.[17] The order did not permit refunds from the small producers if their rates were later found to be unreasonable. Commenting on the general validity of such a scheme, the Supreme Court stated:

This leads to the contention of the pipelines and the large producers that the scheme of indirect regulation envisioned by Order No. 428 unfairly subjects them to the risk of later determination that their gas costs are unjust and unreasonable and to the obligation to make refunds which they cannot in turn recover from the small producers whose arrangement represents the best buy for any party.

16. Plaintiffs also argue that FERC found Equitable's purchasing practices just and reasonable in its sales to Revere Gas Co. but it has already been established that FERC does not concern itself with whether any contractural

17. The Federal Power Commission was FERC's predecessor.

rates have been found too high. But those whose rates are regulated characteristically bear the burden and the risk of justifying their rates and their costs. Rate regulation unavoidably limits profits as well as income. "The fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid." [citation omitted].

*Id.* 417 U.S. at 391, 94 S.Ct. at 2323, 41 L.Ed.2d at 153 (brackets added) (footnote omitted).

The Court went on to note that regulation of producer prices was still experimental and that the Commission was going to keep the procedure under close review. Similarly, here, the PUC review of purchased gas costs is not improper simply because it is retroactive. Also, as in *Texaco,* only time and experience can tell whether Pennsylvania's law will have the effects claimed by plaintiffs, and in that event we anticipate that FERC will protect its own jurisdiction.

C. *Act 74 Does Not Violate The Equal Protection Clause.*

■ Plaintiffs claim that Act 74 violates the fourteenth amendment guarantee of equal protection because section 1318(a) makes the Act applicable to "utilities with gross intrastate operating revenues in excess of $40,000,000." They complain that neither the Act nor its legislative history explain the basis for the distinction and that testimony from a PUC representative is a *post hoc* rationalization.[18] They also argue that Equitable is unique among utilities with a certain level of operating revenue and that this uniqueness bars its grouping with utilities identified by section 1318(a). They point to its regulation by three state commissions, FERC, and the affect of its purchases upon the sales of three pipelines and independent gas producers.

Defendants argue that the classification is a valid one based upon administrative efficiency. Ten utilities meet the threshold revenue requirement and they are accountable for 96% of the operating revenue of all the natural gas companies in Pennsylvania and 97 to 98% of the customers. Limiting the application of Act 74 to the ten largest utilities allows meaningful review of the majority of the purchased gas costs decisions.

In passing upon the equal protection claim we must bear in mind that "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines...." *City of New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511, 517 (1976) (per curiam). Accordingly, we will test plaintiffs' claim "under the lenient standard of rationality that [the Supreme] Court has traditionally applied in considering equal protection challenges to regulation of economic and commercial matters." *Exxon Corporation v. Eagerton,* 462 U.S. 176, 195–96, 103 S.Ct. 2296, 2308, 76 L.Ed.2d 497, 513 (1983). "Under that standard a statute will be sustained if the legislature could have reasonably concluded that the challenged classification would promote a legitimate state purpose." *Id.* at 196, 103 S.Ct. at 2308, 76 L.Ed.2d at 513. Further,

[T]he Supreme Court has stated that legislative classifications will be upheld under rational relationship scrutiny "if any state of facts reasonably can be conceived that will sustain" them. *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. [61] at 78, 31 S.Ct. [337] at 340 [55 L.Ed. 369 (1911)]. "Where ... there are plausible reasons for [the legislature's] action, our inquiry is at an end. It is, of course, 'constitutionally irrelevant whether this reasoning in fact underlay the legislation,' because this Court has never insisted that a legislative body ar-

---

**18.** The remarks of Senator William Moore are somewhat contrary to this position although they do not refer specifically to the $40 million threshhold. *See* Pa.Leg.J. Senate at 2092 (May 2, 1984).

ticulate its reasons for enacting a statute." *U.S. Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980) (citations omitted).

*Price v. Cohen,* 715 F.2d 87, 94 (3d Cir. 1983) (brackets added) (footnote omitted), *cert denied,* 465 U.S. 1032, 104 S.Ct. 1300, 79 L.Ed.2d 700 (1984).

Nevertheless, the Third Circuit Court of Appeals has noted that:

While deferential, the rational relationship test is not "toothless," *U.S. Railroad Retirement Bd. v. Fritz,* 449 U.S. [166] at 184, 101 S.Ct. [453] at 464 [66 L.Ed.2d 368 (1980)]. (Brennan, J., dissenting). As Justice Powell warned in *Schweiker v. Wilson,* "the Court should receive with some skepticism *post hoc* hypotheses about legislative purpose, unsupported by legislative history. When no indication of legislative purpose appears other than the current position of the [government], the court should require that the classification bear a 'fair and substantial relation' to the asserted purpose." *Schweiker v. Wilson,* 450 U.S. [221] at 244–245, 101 S.Ct. [1074] at 1087–88 [67 L.Ed.2d 186 (1981)] (Powell, J., dissenting); *Delaware River Basin Commission v. Bucks Co.,* 641 F.2d 1087, 1096 (3d Cir.1981).

*Id.* at 94 (footnote omitted) (brackets in original). But, "[e]ven this more skeptical approach ... involves an only 'marginally more demanding scrutiny.' *Schweiker v. Wilson,* 450 U.S. at 245, 101 S.Ct. at 1088 (Powell, J., dissenting)." *Id.* at 95 (brackets added).

Based upon the foregoing standard, we conclude that Act 74 does not violate the equal protection clause. Plaintiffs claim that Equitable's "uniqueness" entitles it to prevail on this issue.[19] But other than asserting that uniqueness and relying upon factors that bear upon its other constitutional claims, plaintiffs do not assert why equal protection has been violated. Further, the absence of a reason for the classi-

fication in the statute itself, or in the legislative history, is irrelevant because, as noted above, the Supreme Court has never required a legislature to articulate its reasons for enacting a statute. The absence of such reasons in the legislative history requires a court to determine if the classification bears a "fair and substantial" relation to the subsequently asserted purpose. But this necessitates only a marginally more demanding scrutiny under the rational relationship test. That scrutiny has been easily met in this action. The classification is clearly and directly related to the goal of administrative efficiency asserted by the PUC representative. His testimony was proper to substantiate this purpose and sustains the defendants' position here. *See Delaware River Basin Commission v. Bucks County Water & Sewer Authority,* 641 F.2d 1087, 1099 n. 25 (3d Cir.1981).

We will issue an appropriate order.

## ORDER AND JUDGMENT

AND NOW, this 23rd day of December, 1986, it is ordered that:

1. Judgment is hereby entered in favor of defendants and against plaintiffs on all of plaintiffs' claims except the claim of interference with the right to counsel.

2. Defendant, Attorney General's, motion for sanctions and his motion to exclude an issue are denied.

3. Defendants' motion in limine is dismissed as moot.

4. Defendant, PUC's, motion to amend its answer is denied.

5. The Clerk of Court shall close this file.

---

**19.** "Uniqueness" is based upon the fact that Equitable is regulated by three state commissions

as well as the FERC, and has contractual ties to interstate pipelines and independent producers.